See also 127 F.R.D. 102.

Gladys M. GRIDLEY, Appellee,

v.

CLEVELAND PNEUMATIC COMPANY, a subsidiary of Pneumo Corporation, a subsidiary of IC Industries; Marjorie Ann Smith, individually and as Manager of Employee Benefits and Services; Patricia Borah, individually and as Employee Benefits Administrator; John Hancock Mutual Life Insurance Company.

Appeal of CLEVELAND PNEUMATIC COMPANY, a subsidiary of Pneumo Corporation.

No. 90–5262.

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1990.

Decided Feb. 4, 1991.

William A. Hebe (argued), Spencer, Gleason & Hebe, Wellsboro, Pa., for appellee.

Jonathan E. Butterfield (argued), Murphy, Butterfield & Holland, Williamsport, Pa., for appellant.

Before MANSMANN, ALITO and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge.

This case concerns a dispute between the Cleveland Pneumatic Company ("Cleveland") and Gladys M. Gridley, the wife of a former Cleveland employee, Joseph Gridley, regarding Mrs. Gridley's entitlement to increased life insurance benefits provided by an amendment to the company's group life insurance plan that took effect after Mr. Gridley ceased active work due to terminal cancer. The district court held that Mrs. Gridley was not entitled to the increased benefits under the terms of the group life policy because Mr. Gridley was never "actively at work" following the date when the increased benefits took effect, as required by the policy terms. The court held, however, that Cleveland was obligated under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to pay Mrs. Gridley the increased benefits. The court concluded that a beneficiary may recover benefits due under a summary plan description (*see* 29 U.S.C. § 1022) and that a brochure that was distributed to Cleveland employees at about the time of the new amendment and that generally surveyed employee benefits constituted a summary plan description of the company's life insurance plan. Because this brochure omitted the "actively at work" requirement and contained language that the court believed was inconsistent with this requirement, the court held that

Cleveland was obligated to pay Mrs. Gridley the increased benefits.

We conclude that the brochure in question was not a summary plan description and that, even if it were, Mrs. Gridley would not be entitled to recover the increased benefits. Accordingly, we will reverse.

### I.

Joseph Gridley began work for Cleveland on May 17, 1985 at an annual salary of $33,500. A few years earlier, Mr. Gridley had been afflicted with lung and brain cancer, but at the time of his employment by Cleveland there was no sign of recurrence. When Mr. Gridley began work, Cleveland gave him a variety of materials describing employee benefits. A glossy brochure containing five fold-out panels and entitled "Employee Benefits Summary" (Plaintiff's Exhibit 15) ("P15") provided an overview of the company's benefit plans. (For convenience, we will refer to this document as the "overview brochure" or the "earlier overview brochure.") The Introduction to this overview brochure (P15) stated that "[t]his brochure highlights the major provisions of each of the [company's benefit] plans" and that it had been prepared "for use as a 'quick' reference source of information about [the] benefit plans." The Introduction added: "[y]ou may refer to your *summary plan descriptions* or the official plan documents for more details" (emphasis added). In addition, the Introduction warned that "in the event of any conflict between this brochure and the plan documents, provisions of the plan documents will apply." On the fold-out panels following the Introduction, the overview brochure (P15) provided a brief description of the company's benefits regarding medical and dental care, income protection, survivors' security, pensions, and other matters such as vacations, holidays, education reimbursements, funeral leave, military training, and jury duty.

In addition to this overview brochure (P15), Mr. Gridley received several documents that clearly constituted summary plan descriptions within the meaning of ERISA. Plaintiff's Exhibit 20 ("P20"), entitled "Summary Plan Description—Salary Continuance Plan," described the salary benefits initially available for employees who became unable to work due to illness or disability. Similarly, Defendant's Exhibit C-1 ("D–C1"), entitled "Summary Plan Description—Long–Term Disability Plan," summarized the disability benefits available to company employees after the salary continuance benefits were exhausted. These documents contained the information required by the relevant provision of ERISA, 29 U.S.C. § 1022, such as "[the] name and type of administration of the plan," "the name and address of the person designated as agent for the service of legal process," "the name and address of the administrator," "the names, titles and addresses of any trustee or trustees," "the procedures to be followed in presenting claims for benefits," "and the remedies available under the plan for the redress of claims" that are denied.

With respect to the group insurance plan, which provided life, health, and other insurance benefits, Cleveland did not give Mr. Gridley any document entitled a "summary plan description," but instead furnished a certificate, entitled "Your Group Insurance Plan" ("P14"), that was prepared by the underwriter, John Hancock Mutual Life Insurance Company ("John Hancock"). (For convenience we will refer to this document as the "certificate.") This certificate (P14) was not drafted to serve as a summary plan description, and although the certificate included a lengthy description of the terms of the group insurance policy, it lacked most of the other information required by ERISA.

Both the certificate (P14) and the group insurance policy itself contained provisions specifying that an employee became eligible for an increase in insurance benefits only if he was "actually" or "actively" at work after the increase took effect.[1] The

---

**1.** Neither party has asserted that there is any material difference for present purposes be-

tween the meanings of these two phrases.

group insurance policy stated that an employee "shall not be entitled to any increase in insurance or any additional benefits for which he may be eligible until he actually returns to work." Likewise, the certificate (P14) stated (emphasis added):

*ACTIVELY AT WORK REQUIRE-MENT.*

If you are not *actively at work* on the date an increase in benefits would become effective under the Schedules shown herein, such increase will not become effective until the date you return to active work.

The certificate (P14) defined "actively at work" to mean that the employee must be able to perform "all of the usual and customary duties of his occupation on a regular, full-time basis."[2]

Unlike the group insurance policy and the certificate (P14), the overview brochure (P15) did not mention the "actively at work" requirement but stated that employees were "eligible to participate in [the company's] life insurance plans on [their] first day of employment with the Company."

Under the life insurance policy, Cleveland paid for basic life insurance coverage for its employees. This basic coverage equalled 150% of their annual salaries rounded to the next higher thousand. Thus, for Mr. Gridley, this basic coverage amounted to $51,000. Cleveland employees could also purchase additional life insurance equal to 50% or 100% of their annual salaries rounded to the next higher thousand. Mr. Gridley elected supplemental life insurance equal to 50% of his salary rounded to the next higher thousand—or $17,000. Thus his total life insurance coverage equalled $68,000. When he applied for the supplemental life insurance, Mr. Gridley filled out a "group optional life insurance enrollment card," which stated directly above his signature:

I certify that I am an active full-time employee of the above-named employer and work a regularly scheduled work week with such employer. I understand that if I do not meet these requirements I am not eligible for any insurance....

In November 1985, approximately six months after beginning work with Cleveland, Mr. Gridley was diagnosed with a recurrence of cancer. After November 15, 1985, he never again reported to work or performed any work for Cleveland. He died in June 1986. At no time prior to his death did Mr. or Mrs. Gridley inform Cleveland that Mr. Gridley was terminally ill and would not be returning to work.

At approximately the same time as when Mr. Gridley left work, IC Industries, the owner of Cleveland's parent company, Pneumo Corporation, decided to improve the group insurance program for Cleveland's employees. Marjorie Smith, Cleveland's Manager of Employee Benefits, set up a meeting to explain the changes to the affected employees. Since Mr. Gridley was not at work, his wife was invited to attend the meeting, which occurred on November 25, 1985. At the meeting, Ms. Smith informed the employees that as of January 1, 1986, basic life insurance benefits would be increased to three times salary and that supplemental life insurance would be made available in amounts equal to one, two, or three times annual salary rounded to the next higher thousand. During the presentation at the meeting, the "actively at work" eligibility requirement was not mentioned. Moreover, no Cleveland employee ever subsequently reminded Mr. or Mrs. Gridley of this requirement.

**2.** The complete definition of "actively at work" in the certificate reads as follows:

"actively at work"—an employee shall be considered "actively at work" if he reports for work on the date in question at his usual place of employment with his Employer and such usual place of employment is outside of his home, and if when he so reports he is able to perform all of the usual and customary duties of his occupation on a regular, full-time basis. If an employee does not so report, or if his usual place of employment with his Employer is not outside of his home, he shall be considered "actively at work" if at any time on the date in question, he is neither (i) hospital confined, nor (ii) disabled to a degree that he could not then have reported to a place of employment outside of his home and performed all of the usual and customary duties of his occupation on a regular, full-time basis.

At this meeting, Mrs. Gridley received an updated version of the overview brochure that was strikingly similar in appearance and content to the brochure furnished to Mr. Gridley when he began work. (For convenience, we will refer to this document as the "new brochure" or the "new overview brochure".) The Introduction to this new brochure ("P19") stated that it "highlight[ed] the major provisions of each of the plans as they will be in effect on January 1, 1986." Like its predecessor (P15), the new brochure (P19) explained that "[t]his summary has been prepared for use as a 'quick' reference source of information about your benefit plans." The new brochure (P19), like the earlier overview brochure (P15), also advised: "You may refer to your *summary plan descriptions* or the official plan documents for more details. Of course, in the event of any conflict between this brochure and the plan documents, provisions of the plan documents will apply" (emphasis added).

One of the panels of the new brochure (P19), labeled "SURVIVOR SECURITY," contained an explanation of the increased life insurance benefits available after January 1, 1986, but like the description of the life insurance benefits in the earlier overview brochure (P15), the description omitted any reference to the "actively at work" requirement. Employing the same language as the earlier overview brochure (P15), the new overview brochure (P19) stated: "You are automatically eligible to participate in our life insurance plans on your first day of employment with the Company."

At the meeting on November 25, Mrs. Gridley received an enrollment card for the supplemental insurance. She was instructed that, if Mr. Gridley wanted to obtain these benefits, the card should be signed and returned so that payroll deductions could be processed. The next day, Mr. Gridley completed the card and selected the maximum supplemental life insurance benefits, i.e., three times his salary or $101,000. Together with the $101,000 in basic

coverage provided by the company after January 1, 1986, this supplemental coverage would have given Mr. Gridley a total of $202,000 in life insurance coverage. Immediately above the space where Mr. Gridley signed the card, the following language appeared:

I certify that I am an active, full-time employee of the above-named employer and work a regularly scheduled work week with such employer. I understand that if I do not meet these requirements I am not eligible for any insurance. I certify I have read and understood the above provisions.

After this card was returned and processed, additional amounts were deducted from Mr. Gridley's salary or paid by Mr. Gridley to cover the increase in supplemental insurance coverage.

After leaving work, Mr. Gridley applied for and received benefits under Cleveland's salary continuance and long-term disability plans. In support of these applications, Mr. Gridley's doctor certified that Mr. Gridley was continuously and totally disabled beginning on November 16, 1985.[3] Mr. Gridley also applied for and was awarded social security disability benefits, with disability commencing on November 15, 1985.

After Mr. Gridley's death, Mrs. Gridley submitted a claim through Cleveland to receive $202,000 in death benefits from John Hancock. John Hancock instead issued a check for the sum of $68,426.26, which represented Mr. Gridley's pre-increase coverage plus interest. With the check, John Hancock sent a letter explaining that "because Mr. Gridley had not been actively at work on January 1, 1986 or any time thereafter [Mrs. Gridley] was not eligible to receive the $202,000 which would have been available under the new plan." The overpaid premiums were refunded to Mrs. Gridley.

In 1988, Mrs. Gridley brought suit against Cleveland, John Hancock, and two Cleveland employees in the Middle District

---

**3.** At trial, however, Mr. Gridley's physician testified that Mr. Gridley could have returned to work for some period had he realized that this was necessary to qualify for increased life insurance benefits.

of Pennsylvania, seeking the increased life insurance benefits for which Mrs. Gridley would have been eligible after January 1, 1986. After a non-jury trial, the court entered judgment in favor of Mrs. Gridley and against Cleveland in the amount of $134,000 ($202,000 minus the check previously provided). At the same time, the court entered judgment in favor of the other defendants, John Hancock and the Cleveland employees.

In awarding judgment against Cleveland, the district court held that Cleveland's new overview brochure (P19) constituted a summary plan description within the meaning of ERISA, and the court held that the terms of this summary plan description were enforceable against Cleveland. Since the new overview brochure (P19) lacked any explanation of the "actively at work" requirement and indeed stated that employees became eligible to participate in the life insurance plans on the first day of employment, the court held that Cleveland was obligated to pay the new increased benefits.

By contrast, the court concluded that John Hancock was not liable by virtue of the new overview brochure (P19) because John Hancock played no part in drafting or distributing that document. Furthermore, the court held that the Cleveland employees were not liable because they had no discretionary authority to award or deny life insurance benefits and had no affirmative duty to advise the Gridleys of the "actively at work" requirement.

Although the district court accepted Mrs. Gridley's argument that she was entitled to the increased benefits as a result of the allegedly faulty description in the new overview brochure (P19), the court rejected her contention that she was also entitled to the increased benefits under the group life insurance policy itself. Concluding that Mr. Gridley "was not capable of working his regular eight hours per day, five days per week," the court held that he did not

meet the "actively at work" requirement set out in the policy and certificate (P14).[4]

Finally, the court held that Mrs. Gridley could not recover under the theory of promissory estoppel. Although the court concluded that Cleveland had misled the Gridleys regarding the "actively at work" requirement, the court held that the Gridleys "were not prejudiced or damaged by their reliance on the actions of Cleveland's employees" because Mr. Gridley could not have actively returned to work even if he had tried.

Cleveland appealed; Mrs. Gridley did not cross-appeal the judgments in favor of John Hancock and the Cleveland employees.

## II.

We now consider whether Mrs. Gridley is entitled to recover the increased life insurance benefits under ERISA. Section 502(a) of ERISA, 29 U.S.C. § 1132(a), contains a comprehensive civil enforcement scheme that was "intended to be exclusive." *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987). *See also Ingersoll–Rand Co. v. McClendon*, —— U.S. ——, ——, 111 S.Ct. 478, 485–486, 112 L.Ed.2d 474 (1990); *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1169 (3d Cir.1990). Mrs. Gridley maintains that she is entitled to recover the increased life insurance benefits under two provisions of this comprehensive enforcement scheme.

## A.

First, Mrs. Gridley contends, as the district court apparently held, that she is entitled to recover increased life insurance benefits under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which authorizes a "beneficiary ... to recover benefits due to him under the terms of his plan." Mrs. Gridley maintains that the term "plan" includes a

---

**4.** Applying Massachusetts insurance law, the district court held that the certificate was rele-

vant to clarify any ambiguities in the policy.

summary plan description, that the new overview brochure (P19) constituted a summary plan description, and that ERISA therefore authorizes her to "recover benefits due to [her] under the terms of [the brochure]." We reject this argument both because the new overview brochure (P19) was not a summary plan description and because a summary plan description is not a "plan" within the meaning of Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

■■■ 1. Whether a document constitutes a summary plan description within the meaning of the relevant provision of ERISA, 29 U.S.C. § 1022, involves a determination of "ultimate fact" and is therefore subject to plenary review. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981). Applying this standard, we conclude that the new overview brochure (P19) did not constitute a summary plan description. Four chief factors inform our holding. First, the new overview brochure (P19) contains an important internal reference to "summary plan descriptions." *See Anthony v. Ryder Truck Lines, Inc.,* 611 F.2d 944, 948 (3d Cir.1979). As previously noted, the Introduction of the new overview brochure (P19) stated: "You may refer to your *summary plan descriptions* or the official plan documents for more details." In light of this language, the drafter or drafters could not have thought, and a reasonable reader could not have concluded, that the new overview brochure (P19) itself was a summary plan description.

Second, the new overview brochure (P19) lacks virtually all of the categories of information required by ERISA for summary plan descriptions. Under 29 U.S.C. § 1022(b), a summary plan description must contain 12 categories of information: (1) the name and type of administration of the plan; (2) the name and address of the person designated as agent for the service

of legal process; (3) the name and address of the administrator; (4) the names, titles and addresses of any trustee or trustees; (5) a description of the relevant provisions of any applicable collective bargaining agreement; (6) the plan's requirements respecting eligibility for participation and benefits; (7) a description of the provisions providing for non-forfeitable pension benefits; (8) the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; (9) the source of financing of the plan and the identity of any organization through which benefits are provided; (10) the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; (11) the procedures to be followed in presenting claims for benefits under the plan; and (12) the remedies available under the plan for redress of claims which are denied. The new overview brochure's (P19) description of the life insurance plans, however, lacks any information relating to all but two of these categories, i.e., information relating to eligibility for participation and benefits and information concerning the source of financing. *See Alday v. Container Corp. of America,* 906 F.2d 660, 665 (11th Cir.1990) ("Summary of Benefits Booklet" that lacked much of the information required by 29 U.S.C. § 1022 was not summary plan description); *Etherington v. Bankers Life & Casualty Co.,* 747 F.Supp. 1269, 1276–77 (N.D.Ill.1990) ("Group Insurance Benefits Booklets" that lacked information required by 29 U.S.C. § 1022(b) was not a summary plan description).[5]

Third, the new overview brochure (P19) contains extraordinarily perfunctory descriptions of subjects treated in other company documents that unquestionably constituted summary plan descriptions. As previously noted, when Mr. Gridley began work he was given a 12–page summary

5. The document at issue in this case (P19) is readily distinguishable from the document held to be a summary plan description in *Kochendorfer v. Rockdale Sash & Trim Co., Inc.,* 653 F.Supp. 612 (N.D.Ill.1987), upon which Mrs. Gridley relies. In that case, the document in question did not "indicate that it is not a sum-

mary plan description, or state that another document will govern if inconsistencies exist" (*id.* 616). Here, as previously noted, the new overview brochure (P19) contains a cross-reference to the company's summary plan descriptions and states clearly that the plan controls in the event of any inconsistencies.

plan description regarding the company's salary continuance plan ("Summary Plan Description—Salary Continuance Plan") (P20) and another 12–page summary plan description regarding the long-term disability plan ("Summary Plan Description—Long–Term Disability Plan") (D–C1). These plans, which apparently did not change on January 1, 1986, when the life insurance benefits increased, were also discussed in the new overview brochure (P19), but this entire discussion consisted of the following three sentences:

> Depending on your location and salary classification, a portion of your salary will be continued during certain periods of disability. The provisions of the plans prior to January 1, 1986 remain in effect. Consult your Summary of Benefits for the benefits that apply to you.

If we held that the new overview brochure (P19) constituted the summary plan description for all the plans it summarized (not only the insurance plans but also the salary continuance and long-term disability plans), we would be holding that the company replaced its detailed summary plan descriptions for the salary continuance and long-term disability plans with the patently inadequate three-sentence description set out above and that the company made this replacement even though the salary continuance and long-term disability plans had not changed and there was consequently no apparent need to update or revise the existing summary plan descriptions for those plans. We cannot accept this unnatural interpretation of the new overview brochure (P19). Nor can we accept the equally unnatural alternative interpretation that that document constituted a new summary plan description for the insurance plans but not for the other plans that it surveyed in like fashion.

Finally, the new overview brochure (P19) was plainly an updated version of the earlier overview brochure (P15), which was not a summary plan description. As already noted, when Mr. Gridley received the earlier overview brochure (P15) at the beginning of his employment, he was also given summary plan descriptions for some of the company's plans. In light of these detailed documents, there can be no doubt that the cursory descriptions of the same plans in the earlier overview brochure (P15) did not constitute the summary plan descriptions for those plans. The new overview brochure (P19) is remarkably similar to its predecessor in content, format, and appearance and clearly represents a modified version of the earlier overview brochure (P15) that was prepared to incorporate the insurance changes taking effect on January 1, 1986. Thus, since the earlier overview brochure (P15) was not a summary plan description, the same conclusion almost certainly must apply to the new overview brochure (P19) as well.

The district court held that the new overview brochure (P19) constituted the summary plan description for the life insurance plan after January 1, 1986, for essentially two reasons. First, the court seems to have placed great weight on the fact that Cleveland stopped giving new employees the insurance certificate (P14) when it began distributing the new overview brochure (P19). From this sequence of events, the court appears to have inferred that the new overview brochure (P19) replaced the certificate (P14), but in fact it is apparent that the new overview brochure (P19) replaced the earlier overview brochure (P15). As noted earlier, when Joseph Gridley began work in May 1985, he was given both the earlier overview brochure (P15) and the certificate (P14). At the end of 1985, when those documents had become outdated because of changes in the life insurance plan, the company apparently stopped distributing both of them and began distributing the new overview brochure (P19). In light of the striking similarities between the two brochures, it is abundantly clear that the new overview brochure (P19) replaced the earlier overview brochure (P15), and that neither constituted the summary plan description for any of the company's plans.

■ The district court also found that Cleveland considered the new overview brochure (P19) to be the summary plan description for the insurance plans after January 1, 1986. Although the district court

did not specify the basis for this finding, Mrs. Gridley defends this finding by pointing to testimony by Marjorie Smith, the Benefits Administrator at the company's Cleveland, Ohio, office. On cross-examination, Ms. Smith stated that after the company stopped distributing the certificate (P14) she considered the new overview brochure (P19) to be the summary plan description for life insurance. While this testimony regarding the opinion of a relevant Cleveland employee was certainly entitled to some weight, we believe that this cross-examination testimony alone was plainly insufficient to show that the new overview brochure (P19) was a summary plan description.

■ 2. Even if the new overview brochure (P19) was a summary plan description, Mrs. Gridley was still not entitled to recover increased benefits under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which authorizes a beneficiary to receive benefits due "under the terms of [the] plan." Mrs. Gridley contends (Brief at 22) that "there is no definition in ERISA for the word 'plan'" and that the term should be construed to include a summary plan description. Contrary to Mrs. Gridley's assertion, however, ERISA does contain a definition of the term "plan." In Section 3(3), 29 U.S.C. § 1002(3), the term "plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." This definition clearly does not encompass a summary plan description, and accordingly Mrs. Gridley cannot recover under 29 U.S.C. § 1132(a)(1)(B) for benefits allegedly due under a summary plan description.[6]

### B.

■ In the alternative, Mrs. Gridley contends that she is entitled to recover increased insurance benefits under Section 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a beneficiary "to obtain ... appropriate equitable relief ... to redress [violations of ERISA] or ... to enforce any provisions of [ERISA] or the terms of the plan."[7] Cast in its best terms, Mrs. Gridley's argument with respect to this provision is as follows: the new overview brochure (P19) was a defective summary plan description and thus violated the provision of ERISA, Section 102(b), 29 U.S.C. § 1022(b), specifying what a summary plan description must contain; Mrs. Gridley is therefore entitled to "appropriate equitable relief" to redress this violation; "appropriate equitable relief" in this case consists of the increased life insurance benefits. This argument, however, also fails.

■ As previously discussed, the new overview brochure (P19) was not a summary plan description and thus did not violate the provision of ERISA specifying what a summary plan description must contain, Section 102(b), 29 U.S.C. § 1022(b). Moreover, even if that document were a defective summary plan description, payment of increased life insurance benefits would not constitute appropriate equitable relief. Mrs. Gridley has not identified any equitable doctrine other than promissory estoppel under which she could recover increased life insurance benefits, but it is

6. Contrary to Mrs. Gridley's argument, the district court's decision is not supported by *Genter v. Acme Scale & Supply Co.*, 776 F.2d 1180 (3d Cir.1985). Whereas the district court in this case awarded Mrs. Gridley increased insurance benefits that were not available under the life insurance plan itself, *Genter* awarded increased life insurance benefits that were provided by the life insurance plan. Under the life insurance plan in *Genter*, the employee in question became eligible for increased coverage at company expense when he received a salary in January 1982. He was led to believe that he could not actually obtain the increased coverage until March 1983, and he died in January 1983. This

court held, however, that the company's insurance plan provided a second method for obtaining increased coverage more quickly (*id.* at 1185). Because the deceased employee had been improperly denied the opportunity to take advantage of this method, this court held that the employee's widow was entitled to the increased benefits provided by the plan.

7. Because this argument presents a question of statutory construction, we exercise plenary review. *See, e.g., Chrysler Credit Corp. v. First National Bank and Trust Co.*, 746 F.2d 200, 202 (3d Cir.1984).

apparent that Mrs. Gridley cannot recover under the theory of equitable estoppel.

■ Our precedents indicate that an ERISA reporting or disclosure violation, such as the distribution of an inaccurate summary plan description, cannot provide a basis for equitable estoppel, at least in the absence of "extraordinary circumstances." In *Hozier v. Midwest Fasteners*, 908 F.2d at 1166–71, we considered the remedies available for violations of ERISA's reporting and disclosure provisions, Sections 101–111, 29 U.S.C. § 1021–1031. We noted (908 F.2d at 1167) that "ERISA contains two express causes of action to remedy reporting and disclosure violations as such," Sections 502(a)(4) and (c), 29 U.S.C. § 1132(a)(4) and (c). Declining to tamper with ERISA's comprehensive civil enforcement scheme, we held that the reporting and disclosure violations at issue were irrelevant in determining entitlement to benefits. *See also Berger v. Edgewater Steel Co.*, 911 F.2d 911, 921 (3d Cir.1990). We also noted (*Hozier*, 908 F.2d at 1165 n. 10) that under our precedents equitable estoppel is not available in ERISA cases absent "extraordinary circumstances."

We see no such "extraordinary circumstances" in the present case. Mrs. Gridley asserts what is at best an ordinary equitable estoppel claim. Just as the *Hozier* court found that an alleged "implied representation" that went beyond the terms of the plan did not "colorably" present any "extraordinary circumstances" (908 F.2d at 1165 n. 10), we find no such circumstances present here. Indeed, as the district court held, the present case does not even satisfy the ordinary elements of the doctrine of equitable estoppel.

■ In order to prevail under that doctrine, a party must show (1) a material representation, (2) reasonable reliance upon that representation, and (3) damage resulting from that representation. *Pane v. RCA Corp.*, 868 F.2d 631, 638 (3d Cir. 1989).[8] Here, the district court found that the Gridleys were not prejudiced or damaged by their reliance on the actions of Cleveland employees, and we cannot conclude that this finding was clearly erroneous. As the district court noted, Mr. Gridley would not have been eligible for increased benefits unless he was "actually" or "actively" at work after January 1, 1986. Under the group insurance plan, as the district court held, an employee is not "actually at work" or "actively at work" unless he is able to perform all of the "usual and customary duties of his occupation on a regular, full-time basis," and there is strong evidence that Mr. Gridley could not have met this requirement. In support of Mr. Gridley's application for salary continuance and long-term disability benefits, his physician twice certified that Mr. Gridley was "continuously and totally disabled" from "11/16/85 through indefinite." On this certification, Mr. Gridley's physician also listed the date on which Mr. Gridley would be able to return to work as "indefinite." Mr. Gridley himself stated on his application for long-term benefits that he was suffering from a long list of disabling symptoms.[9] Mr. Gridley also disclosed that his physician had imposed the following restrictions on his activities: "no lifting, no driving car, not to go upstairs." Mr. Gridley's job, however, required both that he climb stairs and that he occasionally lift objects weighing up to 40 pounds. The evidence at trial also showed that in early December 1985 the Gridleys vacated

---

**8.** The First Circuit has held that a beneficiary or participant who fails to show detrimental reliance upon a misleading summary plan description may not recover under ERISA. *Bachelder v. Communications Satellite Corp.*, 837 F.2d 519, 523 (1st Cir.1988). *See also McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir.1985). The Sixth Circuit has held that detrimental reliance is not needed. *Edwards v. State Farm Mutual Auto Ins. Co.*, 851 F.2d 134, 137 (6th Cir.1988). Because this latter decision is inconsistent with our precedents (*see, e.g., Pane v. RCA Corp.*, 868 F.2d at 638)

and finds no support in ERISA's civil enforcement provisions or in the doctrine of equitable estoppel, we decline to follow it.

**9.** Mr. Gridley stated that he was suffering from "extreme fatigue and shortness of breath upon any slight exertion, very weak, bouts of nausea, discomfort and abdominal and right back kidney region pain, phlebitis in legs with difficulty in sleeping nights, difficulty concentrating, difficulty eating and continual weight loss."

their apartment in Cleveland, surrendered their lease, and returned to Wellsboro, Pennsylvania, where Mr. Gridley was hospitalized for some time. These facts amply support the district court's finding that Mr. Gridley could not have performed the "usual and customary duties of his occupation on a regular, full-time basis" after January 1, 1986. It is true, as the district court recognized, that Mr. Gridley's physician testified that Mr. Gridley could have returned to work for some period had he realized that this was necessary in order to obtain increased life insurance benefits. But as the district court observed, Mr. Gridley could not have satisfied the "actively at work" requirement simply by returning to work; he was instead required to be able to perform his "usual and customary duties ... on a regular, full-time basis." Mrs. Gridley argues that the plan administrator would have considered that Mr. Gridley was "actively at work" if he had returned to his job for even a single day after January 1, 1986. The district court correctly held, however, that this interpretation of the "actively at work" requirement is inconsistent with the plan and the interpretation of the underwriter.

Mrs. Gridley contends that the deficient explanation of eligibility for increased benefits in the new overview brochure (P19) deprived her husband of the opportunity to try to satisfy the "actively at work" re-

quirement. In light of the district court's finding that Mr. Gridley was not physically capable of satisfying that requirement, however, this argument is beside the point. Mrs. Gridley also maintains that if her husband had understood the "actively at work" requirement, he could have asked John Hancock for a waiver. But since there is no apparent reason why John Hancock would have been any more willing to grant such a waiver prospectively rather than retrospectively, this argument too must be rejected. Finally, Mrs. Gridley contends that her husband might have been capable of performing the duties of a less demanding job with Cleveland after January 1, 1986, if he had understood the "actively at work" requirement. This argument, which was not addressed by the district court, appears inconsistent with the "actively at work" requirement, which requires that an employee be able to perform the "usual and customary duties of his occupation," and in any event this argument is insufficient to undermine the district court's finding that Mr. Gridley was incapable of returning "actively" to work.[10]

### III.

In conclusion, we hold that Mrs. Gridley is not entitled to recover increased life insurance benefits under any provision of ERISA's comprehensive civil enforcement

---

**10.** Because the requirement of detrimental reliance was not satisfied in this case, we need not decide whether the other elements of equitable estoppel were met. Nevertheless, we note that satisfaction of the remaining elements is problematic. First, it is not clear that the new overview brochure (P19) contained a misrepresentation, as the doctrine of equitable estoppel requires. Mrs. Gridley asserts that that document contradicted the "actively at work" requirement by stating that an employee was "automatically eligible to participate in [the company's] life insurance plan on [the] first day of employment with the Company." It is not apparent, however, that this statement relates to the "actively at work" requirement, which concerns an employee's eligibility for increased benefits. The statement in the new overview brochure (P19) may instead address a *new* employee's eligibility to participate in the insurance plans. Because a new employee will almost invariably be "actively at work" on his "first day of employment with the Company," it is not clear that the statement

in that document is inconsistent with the actively at work requirement.

Moreover, it is unclear that it was reasonable for the Gridleys to rely on the new overview brochure (P19) or the failure of the Cleveland employees to remind them of the actively at work requirement. Not only was the actively at work requirement clearly set out in the certificate (P14), which Mr. Gridley received only six months before he became ill, but the very same description of eligibility contained in the new overview brochure (P19) had also appeared in the earlier overview brochure (P15), which was distributed together with the certificate (P14). Accordingly, it is unclear that the reiteration of the same description of eligibility in the new overview brochure (P19) provided reasonable grounds for believing that the "actively at work" requirement had been changed. Finally, we note that Mr. Gridley was required to certify in his applications for supplemental life insurance that he was actively at work and was a regular, full-time employee.

scheme. Accordingly, the judgment of the district court will be reversed.