OPINION OF THE COURT
MANSMANN, Circuit Judge.
Frederick Curcio, III, M.D., died in an automobile accident while employed as a full *229 time physician at Harrisburg Hospital, which is owned by Capital Health Systems. Capital Health sought to provide to its employees basic life insurance coverage and basic accidental death and dismemberment coverage through John Hancock Mutual Life Insurance Company. Marita L. Curcio, Frederick’s widow, collected $200,000 in life insurance proceeds and $50,000 from the accidental death coverage. Claiming entitlement to an additional $150,000 in accidental death benefits because of representations made by Capital Health in its plan summary document, she brought an action, individually and as executor of Frederick’s estate, against Capital Health and John Hancock under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (1988). The district court granted summary judgment in favor of Mrs. Curcio and Capital Health and against John Hancock. John Hancock appeals and Mrs. Curcio cross-appeals to preserve her rights against Capital Health. We hold that John Hancock is not responsible either for Capital Health’s inaccurate representations made to its employees or for any additional recovery under John Hancock’s clearly stated policy. We further hold that Capital Health is liable under the alternative theories of breach of fiduciary duty and equitable estoppel.
I.
The historical facts of this case are not in dispute. Since October of 1989,[1] John Hancock has provided life insurance and accidental death and dismemberment insurance for all full-time Capital Health employees in an amount equal to the employee’s base annual salary to a maximum of $50,000. John Hancock also offered twenty-one senior employees, who had the same basic coverage as the other employees, the opportunity to purchase supplemental coverage, for both life and AD & D, up to the amount they were currently receiving. Because no one could be added to this group of employees, it became known as the frozen group. Dr. Curcio was not a member of this group.[2]
One year later Capital Health wanted to extend to all employees the opportunity to purchase the same supplemental coverage from John Hancock as offered to the frozen group. Capital Health held group meetings for its employees where it introduced the supplemental coverage through an audio-visual presentation, explaining that supplemental insurance could be purchased in amounts equaling one, two or three times the amount of an employee’s base annual salary, not to exceed $150,000. This coverage amount would be in addition to the coverage amount provided by the basic plan. The presentations clearly represented to the employees that this option was available “to increase your life and AD & D insurances significantly.” The audiotape, which was accompanied by slides, stated in pertinent part:
Finally, let’s look at other important elections you have available under choice plus.
Capital Health provides free group life and accidental death and dismemberment — or AD & D — insurance for all full-time and part-time employees scheduled to work at least 16 hours a week. Each of the coverages is equal to:
• One Times Basic Average Earnings up to a Maximum of $50,000 for full-time employees and,
• One Times Basic Average Earnings up to a Maximum of $25,000 for part-time employees.
You also have an opportunity of purchasing additional coverages up to three times *230 basic average earnings subject to the máxi-mums shown on the chart. (Chart on Screen)
The contributions you pay for these coverages are at low group rates and depend on your amount of coverage and your age. An important point: unless you take advantage of increasing your insurance coverages now, you will only be able to “step up” one additional level of coverage per year — until you reach your coverage limit — if you want higher levels of coverage in the future. In short, this is a one time offer. You can either take advantage of the current enrollment period to increase your life and AD & D insurances significantly or wait until future years to increase coverages on a slower year to year basis. (Emphasis added.)
The dispute is whether the supplemental insurance offered to all the employees was the same as the coverage offered to the frozen group; specifically, did the supplemental coverage include life and AD & D? John Hancock claims the supplemental coverage only included life insurance, and it points to the differing language in each group’s policies to support its position.[3]
Dr. Curcio’s salary made him eligible to purchase the maximum amount of coverage, which he did. Capital Health charged him bi-weekly premiums of $6.00 for this coverage. The record indicates, and the district court so found, that Dr. Cureio believed his coverage to include both life and AD & D insurance. On August 5, 1991, Dr. Cureio died in an automobile accident.
A representative from Capital Health, James Henry, made an inquiry by telephone to John Hancock regarding a determination of benefits due Mrs. Cureio. Then Assistant Sales Manager, Richard Lintner, responded that Dr. Cureio had $400,000 in coverage ($50,000 basic life, $50,000 basic AD & D, $150,000 supplemental life, and $150,000 supplemental AD & D).
Shortly thereafter John Hancock recanted its oral representation of coverage and expressed, before a claim was filed, that its preliminary determination was incorrect and that Dr. Cureio had $150,000 in supplemental life coverage only, giving his beneficiary a total benefits package of $250,000. John Hancock claimed that employees in Dr, Cur-cio’s position never had the opportunity to purchase supplemental AD & D coverage, and even if they did, Dr. Cureio only paid premiums for $150,000 in supplemental life coverage.[4]
Subsequently, Mrs. Cureio filed a claim with John Hancock for proceeds due. John Hancock tendered a check to her in the amount of $250,000. Mrs. Cureio initiated this lawsuit to recover an additional $150,000 in supplemental AD & D benefits.
II.
The district.court concluded that the terms of the policy were ambiguous and, applying the doctrine of contra proferentum, granted summary judgment against John Hancock in favor of Mrs. Cureio.[5] John Hancock appeals.
The district court also held that Capital Health was not a proper party under ERISA because it was neither a benefit plan nor a fiduciary, which resulted from the district court’s finding of a lack of discretion over the *231 determination of benefits under the plan. Thus the district court granted Capital Health’s motion for summary judgment. Mrs. Curcio appeals this order as an alternative theory of recovery.
We have jurisdiction pursuant to 28 U.S.C. § 1291, and our standard of review is plenary. Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 132-33 (3d Cir.1993). Our task is to determine whether, viewing the evidence in the light most favorable to the non-moving party, there exists a genuine issue of material fact such that a reasonable factfinder could return a verdict for that party.[6] Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).
III.
We turn first to Mrs. Cureio’s claim, against John Hancock Mutual Life Insurance Company. The parties concur that the only basis upon which recovery can be had against John Hancock is if there is coverage under the policy that it issued. The district court, utilizing the doctrine of contra proferentum, found coverage to exist. This is a question of law subject to plenary review on appeal. Taylor v. Continental Group, 933 F.2d 1227, 1232 (3d Cir.1991).
The contra proferentum doctrine holds that ambiguities in an insurance policy are to be resolved in favor of the insured. Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 (3d Cir.1993). We look to the number of reasonable interpretations a given contract, provision, or term may receive in determining ambiguity. Taylor, 933 F.2d at 1232. If we find but one reasonable interpretation, then a fortiori there can be no ambiguity. However, if the language is susceptible to more than one reasonable interpretation, then it will be found to be ambiguous. Stendardo v. Federal Nat’l Mortgage Ass’n, 991 F.2d 1089, 1094 (3d Cir.1993).
Here the district court held:
In this case, we conclude that reasonable persons reading the plan descriptions for the basic life insurance and the supplemental life insurance could fairly come to either of the following conclusions: (1) that AD & D coverage is inherent in the phrase “life insurance” such that any supplemental life insurance purchased would automatically include AD & D coverage, or (2) that because AD & D is specifically referred to in the basic plan and not in the supplemental, it was simply not a part of the latter. While our determination that the language is ambiguous hinges on an objective reading of the challenged passage, we find support for this result in the confusion among the defendants in the days and weeks following Dr. Curcio’s death.
Slip op. at 11-12. We disagree with the district court’s analysis in two respects. First, our review of the policy does not reveal an ambiguity. Capital Health seems to have created the ambiguity. Second, the term “life insurance,” when given its fundamental and universally accepted meaning, does not include AD & D coverage. Although our role here is to determine whether there are two possible meanings, were we given the task of interpreting the term, we would hold that the certainty and predictability that a literal construction of the term “life insurance” would provide would better serve the purposes of ERISA. Cf. Rohlman v. Hawkeye-Security Insurance Co., 442 Mich. 520, 502 N.W.2d 310 (1993) (giving a literal construction to the term “occupant” in interpreting the Michigan no-fault act).
The record reveals that the original policy applicable to Dr. Curcio clearly differentiated between life insurance and AD & D insurance. In the table of contents under the heading of “COVERAGES,” there were two entries. Each was discussed separately, the policy set forth two different filing instructions for each respective claim, each bad different termination periods, and the payment of benefits to beneficiaries was provided for separately. Most importantly, life insurance benefits were to be paid upon proof of death; however, AD & D benefits *232 were payable in the event of an accident resulting in an enumerated injury or death. The two are mutually exclusive, that is, one could exist without the other. Suggesting that life insurance would include AD & D coverage is inconsistent with their basic definitions.
When Capital Health asked that supplemental insurance be made available to all employees, the policy was amended accordingly. First, an amendment which described the schedule for the supplemental coverage was added to the original policy, which discussed life insurance only. Subsequently a new policy was issued. This policy, similar to the original, had separate entries for life and AD & D coverage. In setting forth the basic coverage in the master schedule, the new policy mimicked the original. It stated in pertinent part:
BASIC INSURANCE (Non-Contributory)* Life, Accidental Death and Dismemberment Insurance Class Life AD & D (Full Amount)
The very next page described the newly offered supplemental life coverage. Unlike the previous page, it stated:
SUPPLEMENTAL INSURANCE (Contributory) Life Insurance
The headings on these pages make clear that the supplemental insurance included only life coverage, not AD & D. Similar to the original policy, the new policy also distinguished between life and AD & D coverage. It contained two different entries in the table of contents, life and AD & D were discussed separately in the text, the policy set forth two different filing instructions for each respective claim, each had different termination periods, and the payment of benefits to beneficiaries was provided separately. Additionally, the new policy clearly set forth a 90 day waiting period for basic life and AD & D coverage, but required 30 days for the supplemental life insurance. The supplemental life coverage terminated at age 70, contrary to AD & D and basic life.
The foregoing policies and amendments were provided to Capital Health, but there is no evidence that Capital Health ever distributed them to its employees. In fact, it appears that when John Hancock offered to Capital Health copies of the policies and their amendments to give to the employees, Capital Health declined. Rather, Capital Health chose to make and distribute its own summaries. As we discuss infra, it was Capital Health’s summary of the new policy that created the confusion.
Therefore, we conclude that John Hancock’s insurance policies were not ambiguous. Further, the district court’s suggested interpretation of the term life insurance is overly broad; life insurance does not inherently include AD & D insurance. The district court erred in the initial steps of its analysis. Thus, we will reverse the district court’s order granting Mrs. Curcio’s motion for summary judgment with respect to John Hancock and enter an order granting judgment in its favor.[7]
We turn now to the issues involving Capital Health.
IV.
ERISA provides:
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or dis *233 cretionary responsibility in the administration of such plan.
29 U.S.C. § 1002(21)(A).[8]
Capital Health argues that ERISA only permits suits to recover benefits against the plan as an entity and against the fiduciary of the plan, and because Capital Health is neither of these, it is not a proper party under ERISA. Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir.1985) (citing §§ 1132(d), 1109(a) and 1105). The district court agreed with Capital Health that it is neither a “plan” nor a fiduciary. We believe it self evident that Capital Health is not a “plan;” however, we take issue with the failure to find fiduciary status.
We agree with the district court that the linchpin of fiduciary status under ERISA is discretion. Here the district court found that “John Hancock’s refusal to follow Capital Health’s directive indicates that the employer wielded no discretionary authority over the granting of benefits.” Slip op. at 11. Thus it concluded that Capital Health could not be held hable for Curcio’s benefits. It appears the district court relied on the second phrase of subsection (i) above, “authority or control respecting management or disposition of its assets,” as the basis for its decision. 29 U.S.C. § 1002(21)(A)(i). Unfortunately, the court failed to examine how the first phrase of subsection (i), respecting the management of the plan, or subsection (iii), the plan’s administration, might affect Capital Health’s fiduciary status.[9] This is where we continue the analysis.
Our task, simply stated, is to resolve whether Capital Health maintained any authority or control over the management of the plan’s assets, management of the plan in general, or maintained any responsibility over the administration of the plan. If we find such to be the ease, we have a fortiori found Capital Health to be a fiduciary. We start from the standpoint that we have previously held that ERISA broadly defines a fiduciary. Smith v. Hartford Ins. Group, 6 F.3d 131, 141 n. 13 (3d Cir.1993). See also H. Stennis Little, Jr. and Larry T. Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand.L.Rev. 1, 4 (1977).
In Smith we found a hospital that gave assurances of continued coverage after changing health plans to be a fiduciary responsible for its employees’ loss in benefits when the new plan failed to cover a disabled employee. We noted that fiduciary status under ERISA is broadly defined and held that the circumstances of that case dictated our finding that the hospital was a fiduciary. Smith, 6 F.3d- at 141 n. 3. The particular circumstances of Smith are similar to our facts here. After the hospital decided to replace its Blue Cross/Blue Shield policy with a self-funded insurance plan and because the employees had the option to convert to an individual Blue Cross/Blue Shield policy instead of enrolling in the new plan, the hospital’s personnel director conducted seminars to help employees make their choices. Id. at 135-36. On the basis of these actions, we found the hospital to have fiduciary status.
Similarly, in Genter v. ACME Scale & Supply Co., 776 F.2d 1180 (3d Cir.1985), we held that ACME Scale & Supply met the ERISA definition of fiduciary as an employer-administrator of the plan at issue. Id. at 1184. We found that the employer exercised discretionary authority and control in managing the plan by notifying certain employees when they were eligible for an increase in life insurance coverage not explained in the terms of the plan. Id. at 1184-85. The employer’s failure to notify all employees generally was deemed a breach of the fiduciary duty ERISA imposes. Id. at 1185-86. See also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133 (3d Cir.1993) (finding employer to have fiduciary status solely on the basis of its role as plan administrator under *234 ERISA); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir.1990) (holding that when employers serve as plan administrators, they assume the role of fiduciary under ERISA).[10]
ERISA makes clear that a fiduciary is one that maintains discretionary authority or discretionary responsibility in the administration of the plan.[11] ERISA defines “administrator” as “the person specifically so designated by the terms of the instrument under which the plan is operated.” § 1002(16)(A)(i) (other definitions are stated, but are not applicable here). Capital Health, in its employee benefits booklet, labels itself as the plan administrator.[12] It seems obvious to us that a plan administrator has responsibility in the administration of the plan. H. Stennis Little, Jr. and Larry T. Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand.L.Rev. 1, 6 (1977).
Here Capital Health announced the new plan to its employees through literature and meetings. Indeed, at the plan’s inception John Hancock offered to print booklet certificates for each and every employee, but Capital declined. Capital Health chose to print and distribute its own booklet certificates describing the plan and each of the plan’s amendments. The general information section of the Choice Plus Booklet distributed by Capital Health stated that the plan would be administered through the Employee Relations Department of Capital Health Systems. It further stated that Capital Health could modify or amend the plan at any time at its sole discretion, and that Capital Health could terminate the plan at any time. Finally, the information provided that a covered person’s benefits may not be assigned, except by the consent of Capital Health. The Supreme Court has held that “one is a fiduciary to the extent he exercises any discretionary authority or control.” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 955-56, 103 L.Ed.2d 80 (1989).
We conclude that Capital Health maintained sufficient discretionary authority and responsibility in the administration of the plan so as to satisfy the statutory definition of a fiduciary, § 1002(21)(A)(iii), thus making it a proper party under ERISA.[13] *235 Therefore, we need not address Curcio’s contention that ERISA permits suits against parties other than plans and fiduciaries.[14] We caution in passing, as we have before, that the district courts should not easily fashion additional ERISA claims and parties outside congressional intent under the guise of federal common law. Plucinski v. I.A.M. Nat’l Pension Fund, 875 F.2d 1052, 1056 (3d Cir.1989).
V.
We have held that an employer can be liable under ERISA in its fiduciary capacity for making affirmative misrepresentations on breach of fiduciary duty and equitable estoppel theories. Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133-35 (3d Cir.1993). See also Haberem v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1502-03 (3d Cir.1994); Smith v. Hartford Ins. Group, 6 F.3d 131, 141 n. 13 (3d Cir.1993). Here Mrs. Curcio primarily presents an equitable estoppel claim, which is authorized under ERISA pursuant to § 1132(a)(3)(B) set forth above. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1298 (3d Cir.1993) (holding that § 1132(a)(3)(B) authorizes the award of appropriate equitable relief to a beneficiary for violations of ERISA).[15] She alternatively argues that Capital Health is subject to liability for breach of its fiduciary duty pursuant to § 1109.[16]
We turn first to Mrs. Cureio’s primary argument that Capital Health’s representations made in describing its new plan to its employees give rise to an equitable estoppel claim under ERISA. To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir.1993) (citing Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir.1991)). The district court did *236 not address Mrs. Cureio’s estoppel claim, presumably because it found Capital Health to be an improper party under ERISA. The determination of an equitable estoppel claim is a mixed question of law and fact. Fischer, 994 F.2d at 135. Here the parties do not dispute the facts — the written record contains all the evidence. Indeed, in presenting their motions for summary judgment, the parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact. Having found Capital Health to be a proper party, we now turn to her equitable theory.[17]
A.
First, Mrs. Curcio must show that Capital Health made material representations. Capital Health’s representations regarding supplemental life and supplemental AD & D insurance began with an audiovisual presentation that Capital Health made in an effort to solicit its employees to enroll in its new insurance program entitled “New Choice Plus Flexible Benefits Plan.” The audiotape, which was accompanied by slides, stated in pertinent part:
In short, this is a one time offer. You can either take advantage of the current enrollment period to increase your life and AD & D insurances signifícantly or wait until future years to increase coverages on a slower year to year basis. (Emphasis added.)
This was not the only time Capital Health discussed life and AD & D insurance together. In the summary plan description that Capital Health furnished to its employees for the original coverage, the section describing the amounts of insurance coverage discussed life and AD & D as separate coverages. Nonetheless, in stating the amount of coverage, the summary plan document stated that the AD & D coverage would be “[a]n amount equal to your Term Life Insurance.” When Capital Health made Choice Plus available, the plan that provided supplemental life and AD & D coverages, rather than provide a formal amendment to the summary plan description, it furnished a pamphlet with a section entitled “Group Life & AD & D Insurance Coverages.” Cf. Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310 (3d Cir.1991) (overview brochure did not meet ERISA requirements for supplemental summary plan description). This section begins:
The Capital Health System provides all employees scheduled to work at least 16 hours a week with Basie Group Life Insurance and Accidental Death and Dismemberment (AD & D) Insurance at no cost. With Choice Plus you also have the opportunity to purchase additional amounts, up to three times your Base Annual Earnings, at low group rates.
Finally, this section of the pamphlet concludes:
This pamphlet highlights the Group Life Insurance and Accidental Death and Dismemberment Insurance coverages available to you. For more detailed information on your plans, you should refer to your Summary Plan Descriptions covering them. If questions arise, the Legal Plan Documents will govern in all cases.
Although the foregoing is a general summary of the coverages discussed in this section of the pamphlet, coupling this information, which describes the coverages as separate but related, with the other information furnished to the employees, it was reasonable for Dr. Curcio to conclude that both life and AD & D insurance would continue to be made available in equal amounts, that is, in supplemental form. Cf. 29 U.S.C. § 1024(b)(1)(A) (requires that material modifications be written in a manner calculated to be understood by the average plan participant). Genter v. Acme Scale & Supply Co., 776 F.2d 1180, 1185 (3d Cir.1985) (holding *237 that a “summary plan description must not mislead, misinform, or fail to inform participants and beneficiaries of the Plan”). See also Bower v. Bunker Hill Co., 725 F.2d 1221, 1224-25 (9th Cir.1984) (misleading summary plan description coupled with management misrepresentations precluded summary judgment for employer).
Nevertheless, the question is whether these representations are material. We have held that any provision of a plan subject to ERISA that establishes a benefit is a material term of the plan. Baker v. Lukens Steel Co., 793 F.2d 509, 512 (3d Cir.1986). Here Capital Health was actually representing that the plan was offering a new benefit; thus, we find that the representations Capital Health made were “material representations.” See also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir.1993) (“[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision....”).
B.
Second Mrs. Curcio must demonstrate reasonable and detrimental reliance upon the representations Capital Health made. This factor, which is generally referred to as reliance, has within it two sub-factors: reasonableness and injury. Smith, 6 F.3d at 137.[18] Mrs. Curcio testified in a sworn statement that she and her husband discussed the options available under the Choice Plus program, “including increasing the death and dismemberment coverage.” She testified that they had recently bought a home and because the coverage was so reasonably priced, they joked about his dying in an accident, her receiving double benefits, and paying off the mortgage. Subsequent to this discussion, Dr. Curcio filled out an enrollment form electing the maximum amount of coverage. This form referred only to “Group Life Insurance Options.” One month later, Dr. Cuxcio signed another form confirming his elections and the appropriate payroll deductions. This second form did not distinguish between life and AD & D coverage for either basic or supplemental benefits.
In Smith we held that the plaintiffs con-elusory allegations that the Smiths could have obtained alternative coverage, without more, were insufficient to withstand summary judgment. Smith, 6 F.3d at 137. Here we find the meeting between Dr. and Mrs. Curcio significant. There is more than conclusory statements; the Curcios had an actual discussion about the protection being afforded through the purchase of additional AD & D insurance. For these reasons we conclude that the Curcios have suffered an injury in giving up an opportunity to accommodate their insurance needs through an independent insurance carrier because of their reasonable reliance on Capital Health’s representations. Cf. McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566,1570 (11th Cir.1985) (“It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.”)
C.
Finally, Mrs. Curcio must demonstrate the existence of extraordinary circumstances. We have not specifically defined this term, rather we rely on caselaw to establish its parameters. In Rosen v. Hotel and Restaurant Employees and Bartender’s Union, 637 F.2d 592 (3d Cir.1981), we found that extraordinary circumstances existed when the trustee of a pension fund advised Rosen that his pension was in jeopardy due to his employer’s failure to make payments to the fund, allowed Rosen to write out a check for the remainder of the employer’s debt, and deposited the check. Id. at 598. We held that the trustee was then estopped *238 from asserting that Rosen’s payment did not entitle him to his pension. Id. By contrast, in Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310 (3d Cir.1991), Gridley, while continually and totally disabled in the hospital, increased his life insurance coverage under a plan that specifically required active, full-time status for such an increase. Although the employer deducted additional amounts from his salary to cover the increase, we found that extraordinary circumstances did not exist when the insurance carrier refused the additional amount. Id. at 1319 (citing Hozier v. Midwest Fasteners Inc., 908 F.2d 1155, 1165 n. 10 (3d Cir.1990)).
Under the facts of Smith, which are similar to our case here, we held that the fact finder could determine that extraordinary circumstances were established. Smith, 6 F.3d at 142. In Smith the hospital repeatedly made written and oral assurances that Mrs. Smith had a specific type of coverage. Id. Ironically, here we have another hospital misrepresenting the type of coverage for which recipients could enroll. Capital Health compounded its error by reassuring Mrs. Curcio that she was covered in the amount of $400,000 after the accidental death of her husband. In the face of such a tragic loss there is a certain degree of solace in knowing that financial woes are not on the horizon. Although it was not in Capital Health’s control, John Hancock contributed to the anguish by first confirming the coverage Mrs. Curcio expected and then disclaiming that such protection would be forthcoming.
The roller coaster did not stop there. Capital Health supported Mrs. Curcio’s claim to the point of encouraging her to file suit, even offering to pay her legal fees. It retained outside counsel to review the matter and offered his services to her without charge. It continually urged John Hancock to honor the supplemental AD & D, despite John Hancock’s refusal. Somewhere along the way Capital Health had a change of heart, for it now argues that supplemental AD & D was never offered in the first place.
These events in our view are demonstrative of extraordinary circumstances. Thus, having satisfied the elements of her equitable estoppel claim and there being no reason to remand for further factual development, we conclude that Mrs. Curcio has established Capital Health’s liability to her in the amount of $150,000.[19] Alternatively, we now briefly address Mrs. Curcio’s argument regarding breach of fiduciary duty.
VI.
In Fischer we held that a plan administrator may not materially misrepresent, either negligently or intentionally, modifications to an employee pension benefits plan. “Put simply, when a plan administrator speaks, it must speak truthfully.” Fischer, 994 F.2d at 135. See also Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir.1993) (discussing fiduciary’s duty not to misinform); Kurz v. Philadelphia Elec. Co., 994 F.2d 136, 139 (3d Cir.1993) (discussing the holding in Fischer). We further held in Fischer that material misrepresentations would subject a plan administrator to liability for breach of its fiduciary duty. Fischer, 994 F.2d at 133-34 (citing Payonk v. HMW Indus., Inc., 883 F.2d 221 (3d Cir.1989)). We have just found Capital Health responsible for making material misrepresentations for purposes of an equitable theory of relief. It is thus a short step to conclude that Capital Health breached its fiduciary duty.
Our analysis rests on the notion that a fiduciary is required to “discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries.” 29 U.S.C. § 1104(a)(1). See Fischer, 994 F.2d at 133. Clearly Capital Health did not do so. Therefore, we hold that Mrs. Curcio’s alternate argument provides additional support *239 for our conclusion that Capital Health is liable to Mrs. Curcio for the $150,000 in supplemental AD & D.
VII.
On the basis of the foregoing, we will reverse in part and affirm in part the district court’s order. We will reverse that part of the order which denied John Hancock’s motion for summary judgment and granted it in favor of Capital Health. We will affirm that part of the court’s order which granted Mrs. Curdo’s motion for summary judgment and entered judgment in her favor, but we will reverse the judgment entered against John Hancock and enter it against Capital Health in the amount of $150,000.

. Prior to October, 1989, Capital Health contracted with Phoenix and Prudential Insurance Companies for its employee insurance program. In the summer of 1989 Capital Health hired Coopers & Lybrand to interview various other insurance companies in an effort to acquire a new plan. Coopers & Lybrand negotiated the agreement with John Hancock on behalf of Capital Health.

. John Hancock asserts that originally it did not intend to provide to the frozen group a policy containing additional AD & D benefits. Although those additional benefits were never negotiated with Capital Health, because John Hancock was receiving an additional amount in premiums above that which was expected for the life coverage and which seemed to represent an AD & D premium, John Hancock agreed to add AD & D to the frozen group's coverage. John Hancock issued a new policy indicating the change.

. Just as in the frozen group's situation a year earlier, John Hancock issued new policies to reflect the change in coverage. However, unlike the frozen group’s premiums, John Hancock argues that the premiums for the general group's new policy only included payments for life coverage.

. Initially Capital Health argued to John Hancock that additional AD & D benefits were included in the contributory plan and encouraged Mrs. Cureio to file suit against John Hancock to challenge the determination of benefits under the policy. Capital Health urged John Hancock to honor the additional AD & D amount, but John Hancock refused. Subsequently, Capital Health changed its position and now contends that the additional AD & D was never included in the policy.

.This suit was originally filed in the Court of Common Pleas of Dauphin County, Pennsylvania. Because Mrs. Curcio’s claims were governed by ERISA, John Hancock removed the case to the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1441. An amended complaint was filed on July 16, 1992, asserting theories of relief grounded in ERISA.

. In presenting their motions for summary judgment, the parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact.

. Because we find that the insurance policy is not ambiguous, we need not address the parties’ arguments regarding the district court's use of the contra proferentum doctrine. We note in passing that any question about the use of this doctrine in ERISA cases that was left open in Taylor v. Continental Group, 933 F.2d 1227 (3d Cir.1991), was answered in our decision in Heasley v. Belden & Blake Corp., 2 F.3d 1249 (3d Cir.1993).

. It is without doubt that the insurance policy at issue here is part of an employee benefit plan within the meaning of ERISA. 29 U.S.C. § 1002(1) and (3). In order to comply with ERISA requirements, 29 U.S.C. § 1022, Capital Health published to its employees a Statement of ERISA Rights and a list of General Provisions and Information. Further, John Hancock asserted in paragraph four of its motion to remove this case to federal court that the life insurance policy is an employee welfare plan subject to the provisions of ERISA.

. Subsection (ii) does not seem to apply nor does Mrs. Curcio so argue.

. We have previously summarized the law in this area as follows:
[W]here an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by ERISA attach. Where, however, employers conduct businesses and make business decisions not regulated by ERISA, no fiduciary duties apply. And, when employers wear "two hats” as employers and as administrators "... they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.”
Payonk v. HMW Industries, Inc., 883 F.2d 221, 225 (3d Cir.1989) (citations omitted).

. Section 1102(a)(1) states that "[e]very employee benefit plan ... shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." Section 1102(a)(2) further states that "the term ‘named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary.” We have been unable to locate, nor do the parties point out, the “named fiduciary” of the Capital Health plan.

. Capital Health calls to our attention a case from the Ninth Circuit that it claims supports its position that it is not a fiduciary. Gelardi v. Pertec Computer Corp., 761 F.2d 1323 (9th Cir.1985). Gelardi is easily distinguishable for, unlike our case, the employer relinquished its role as plan administrator by hiring an outside corporation to administer the plan; and as a result, the Ninth Circuit held that the employer was not “a fiduciary because it retained no discretionary control over the disposition of claims.” Id. at 1325. Surprisingly, the court also held that the retained administrator was not a fiduciary because it did not "exercise fiduciary responsibilities in the consideration of claims. [It] perform[ed] only administrative functions, processing claims within a framework of policies, rules, and procedures established by others.” Id. at 1325. We emphasize that the Ninth Circuit, similar to the district court here, failed to analyze the definitional section of fiduciary pertaining to the plan’s administration. § 1002(21)(A)(iii).

.Our holding is with respect to § 1002(2l)(A)(iii) only. As stated above, the first phrase of subsection (i), authority or control respecting the management of the plan, may also lend support; however, it is unnecessary for our conclusion here, and we reserve for another day the task of defining its parameters.

.ERISA affords the beneficiary of an employee benefit plan the ability to bring a civil suit to recover benefits due. It provides in part:
(a) Persons empowered to bring a civil action A civil action may be brought—
(1) by a participant or beneficiary ...
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
(3) by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief ... (ii) to enforce any provisions of this subchapter or the terms of the plan.
‡ £ ‡ !}s
(d) Status of employee benefit plan as entity
(2) Any money judgment under this sub-chapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.
29 U.S.C. § 1132 (emphasis added). Mrs. Curcio further contends that the “any other person” phrase of § 1132(d)(2) authorizes a suit against any person who undertakes a promissory obligation to provide benefits pursuant to the terms of an ERISA regulated plan. Although she argues that such is plainly the rule in the Third Circuit, the cases she cites clearly do not support this theory. Heasley v. Belden and Blake Corp., 2 F.3d 1249, 1258 n. 10 (3d Cir.1993); Ulmer v. Harsco Corp., 884 F.2d 98, 102 n. 1 (3d Cir.1989); Anthuis v. Colt Industries Operating Corp., 789 F.2d 207, 212-13 (3d Cir.1986).

. Notably, we have recently held that damages are not recoverable under § 1132(a)(1)(B). Haberem v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d at 1503. Here, Mrs. Curcio relies on § 1132(a)(3)(B).

. Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.
29 U.S.C. § 1109(a).
Mrs. Curcio argues that Capital Health need not be a fiduciary to be found liable under an equitable estoppel theory under ERISA. Because we find Capital Health to be a fiduciary, we need not reach this issue. Cf. Smith v. Hartford Ins. Group, 6 F.3d 131, 141 n. 13 (3d Cir.1993) (intimating that fiduciary status is required to be liable on an equitable estoppel claim under ERISA).

. The equitable theory of relief under ERISA is not to be construed as conflicting with our precedent precluding oral or informal amendments to ERISA benefit plans. Confer v. Custom Engineering Co., 952 F.2d 41, 43 (3d Cir.1991); Frank v. Colt Industries, Inc., 910 F.2d 90, 98 (3d Cir.1990); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163-64 (3d Cir.1990). Cf. Haberem v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491 n. 6 (3d Cir.1994). Here, Capital Health not only made oral representations, but also distributed written material describing the coverage.

. But see Edwards v. State Farm Mut. Auto. Ins. Co., 851 F.2d 134, 137 (6th Cir.1988) (employee benefit plan claimant who had been misled by summary plan description and reassuring letter from management, need not show detrimental reliance). Because it is inconsistent with our precedents, we have previously declined to follow Edwards. Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 n. 8 (3d Cir.1991).

. The dissent suggests, inter alia, that we should remand to the district court for factfinding on the elements of equitable estoppel. We note, however, that the parties do not dispute the facts. The parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact. We are of the view that reasonable minds could not differ on the establishment of the elements of equitable estop-pel in this case. Accordingly, it is appropriate for us to require the district court to enter judgment.