

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-1994

# Curcio v. John Hancock Mutual Life Ins. Co.

Precedential or Non-Precedential:

Docket 92-2047

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Curcio v. John Hancock Mutual Life Ins. Co." (1994). *1994 Decisions.* Paper 111.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/111

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 93-7545 and 93-7556
_____


MARITA L. CURCIO;
THE ESTATE OF FREDERICK CURCIO, III

vs.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY;
CAPITAL HEALTH SYSTEMS

    John Hancock Mutual Life Insurance Company
    ("John Hancock"),

                  <u>Appellant</u> in No. 93-7545


MARITA L. CURCIO;
THE ESTATE OF FREDERICK CURCIO, III

vs.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY;
CAPITAL HEALTH SYSTEMS

    MARITA L. CURCIO, INDIVIDUALLY AND AS EXECUTRIX OF
    THE ESTATE OF FREDERICK CURCIO, III

                  <u>Appellant</u> in No. 73-7556
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 92-00789)
_____


Argued
March 10, 1994
Before:  MANSMANN and LEWIS, <u>Circuit</u> <u>Judges</u> and
McKELVIE, <u>District</u> <u>Judge</u>.*

(Filed August 17, 1994)
_____

*      Honorable Roderick R. McKelvie of the United States District Court for the  District of Delaware, sitting by designation.

Michael D. Fishbein, Esquire (ARGUED)
Levin, Fishbein, Sedran & Berman
320 Walnut Street
Philadelphia, PA  19106

  Counsel for Appellee/Cross Appellant Marita L. Curcio

James K. Thomas, II, Esquire
Richard C. Seneca, Esquire (ARGUED)
Thomas, Thomas & Hafer
305 North Front Street
P.O. Box 999
Harrisburg, PA  17108

  Counsel for Appellee CAP Health Systems

Alan R. Boynton, Jr., Esquire (ARGUED)
McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA  17108

  Counsel for Appellant

_____

OPINION OF THE COURT
_____


MANSMANN,  <u>Circuit</u> <u>Judge</u>.

        Frederick Curcio, III, M.D., died in an automobile accident while employed as a full time physician at Harrisburg Hospital, which is owned by Capital Health Systems.  Capital Health sought to provide to its employees basic life insurance coverage and basic accidental death and dismemberment coverage through John Hancock Mutual Life Insurance Company.  Marita L. Curcio, Frederick's widow, collected $200,000 in life insurance proceeds and $50,000 from the accidental death coverage.

Claiming entitlement to an additional $150,000 in accidental death benefits because of representations made by Capital Health in its plan summary document, she brought an action, individually and as executor of Frederick's estate, against Capital Health and John Hancock under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (1988). The district court granted summary judgment in favor of Mrs. Curcio and Capital Health and against John Hancock. John Hancock appeals and Mrs. Curcio cross-appeals to preserve her rights against Capital Health. We hold that John Hancock is not responsible either for Capital Health's inaccurate representations made to its employees or for any additional recovery under John Hancock's clearly stated policy. We further hold that Capital Health is liable under the alternative theories of breach of fiduciary duty and equitable estoppel.

I.

The historical facts of this case are not in dispute. Since October of 1989,[1] John Hancock has provided life insurance and accidental death and dismemberment insurance for all full-time Capital Health employees in an amount equal to the employee's base annual salary to a maximum of $50,000. John

---

[1]. Prior to October, 1989, Capital Health contracted with Phoenix and Prudential Insurance Companies for its employee insurance program. In the summer of 1989 Capital Health hired Coopers & Lybrand to interview various other insurance companies in an effort to acquire a new plan. Coopers & Lybrand negotiated the agreement with John Hancock on behalf of Capital Health.

Hancock also offered twenty-one senior employees, who had the same basic coverage as the other employees, the opportunity to purchase supplemental coverage, for both life and AD&D, up to the amount they were currently receiving. Because no one could be added to this group of employees, it became known as the frozen group. Dr. Curcio was not a member of this group.[2]

One year later Capital Health wanted to extend to all employees the opportunity to purchase the same supplemental coverage from John Hancock as offered to the frozen group. Capital Health held group meetings for its employees where it introduced the supplemental coverage through an audio-visual presentation, explaining that supplemental insurance could be purchased in amounts equaling one, two or three times the amount of an employee's base annual salary, not to exceed $150,000. This coverage amount would be in addition to the coverage amount provided by the basic plan. The presentations clearly represented to the employees that this option was available "to increase your life and AD&D insurances significantly." The audiotape, which was accompanied by slides, stated in pertinent part:

---

[2]. John Hancock asserts that originally it did not intend to provide to the frozen group a policy containing additional AD&D benefits. Although those additional benefits were never negotiated with Capital Health, because John Hancock was receiving an additional amount in premiums above that which was expected for the life coverage and which seemed to represent an AD&D premium, John Hancock agreed to add AD&D to the frozen group's coverage. John Hancock issued a new policy indicating the change.

Finally, let's look at other important elections you have available under choice plus.

Capital Health provides free group life and accidental death and dismemberment –– or AD&D –– insurance for all full-time and part-time employees scheduled to work at least 16 hours a week.  Each of the coverages is equal to:

- One Times Basic Average Earnings up to a Maximum of $50,000 for full-time employees and,

- One Times Basic Average Earnings up to a Maximum of $25,000 for part-time employees.

You also have an opportunity of purchasing additional coverages up to three times basic average earnings subject to the maximums shown on the chart.  (Chart on Screen)

The contributions you pay for these coverages are at low group rates and depend on your amount of coverage and your age.  An important point:  unless you take advantage of increasing your insurance coverages now, you will only be able to "step up" one additional level of coverage per year –– until you reach your coverage limit –– if you want higher levels of coverage in the future.  In short, this is a one time offer.  You can either take advantage of the current enrollment period **to increase your life and AD&D insurances significantly** or wait until future years to increase coverages on a slower year to year basis.  (Emphasis added.)

The dispute is whether the supplemental insurance offered to all the employees was the same as the coverage offered to the frozen group; specifically, did the supplemental coverage include life and AD&D?  John Hancock claims the supplemental coverage only included life insurance, and it points to the

differing language in each group's policies to support its position.[3]

Dr. Curcio's salary made him eligible to purchase the maximum amount of coverage, which he did. Capital Health charged him bi-weekly premiums of $6.00 for this coverage. The record indicates, and the district court so found, that Dr. Curcio believed his coverage to include both life and AD&D insurance. On August 5, 1991, Dr. Curcio died in an automobile accident.

A representative from Capital Health, James Henry, made an inquiry by telephone to John Hancock regarding a determination of benefits due Mrs. Curcio. Then Assistant Sales Manager, Richard Lintner, responded that Dr. Curcio had $400,000 in coverage ($50,000 basic life, $50,000 basic AD&D, $150,000 supplemental life, and $150,000 supplemental AD&D).

Shortly thereafter John Hancock recanted its oral representation of coverage and expressed, before a claim was filed, that its preliminary determination was incorrect and that Dr. Curcio had $150,000 in supplemental life coverage only, giving his beneficiary a total benefits package of $250,000. John Hancock claimed that employees in Dr. Curcio's position never had the opportunity to purchase supplemental AD&D coverage,

---

[3]. Just as in the frozen group's situation a year earlier, John Hancock issued new policies to reflect the change in coverage. However, unlike the frozen group's premiums, John Hancock argues that the premiums for the general group's new policy only included payments for life coverage.

and even if they did, Dr. Curcio only paid premiums for $150,000 in supplemental life coverage.[4]

Subsequently, Mrs. Curcio filed a claim with John Hancock for proceeds due. John Hancock tendered a check to her in the amount of $250,000. Mrs. Curcio initiated this lawsuit to recover an additional $150,000 in supplemental AD&D benefits.

## II.

The district court concluded that the terms of the policy were ambiguous and, applying the doctrine of contra proferentum, granted summary judgment against John Hancock in favor of Mrs. Curcio.[5] John Hancock appeals.

The district court also held that Capital Health was not a proper party under ERISA because it was neither a benefit plan nor a fiduciary, which resulted from the district court's finding of a lack of discretion over the determination of benefits under the plan. Thus the district court granted Capital

_____

[4]. Initially Capital Health argued to John Hancock that additional AD&D benefits were included in the contributory plan and encouraged Mrs. Curcio to file suit against John Hancock to challenge the determination of benefits under the policy. Capital Health urged John Hancock to honor the additional AD&D amount, but John Hancock refused. Subsequently, Capital Health changed its position and now contends that the additional AD&D was never included in the policy.

[5]. This suit was originally filed in the Court of Common Pleas of Dauphin County, Pennsylvania. Because Mrs. Curcio's claims were governed by ERISA, John Hancock removed the case to the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1441. An amended complaint was filed on July 16, 1992, asserting theories of relief grounded in ERISA.

Health's motion for summary judgment.  Mrs. Curcio appeals this order as an alternative theory of recovery.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and our standard of review is plenary.  Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 132–33 (3d Cir. 1993).  Our task is to determine whether, viewing the evidence in the light most favorable to the non-moving party, there exists a genuine issue of material fact such that a reasonable factfinder could return a verdict for that party.[6]  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

III.

We turn first to Mrs. Curcio's claim against John Hancock Mutual Life Insurance Company.  The parties concur that the only basis upon which recovery can be had against John Hancock is if there is coverage under the policy that it issued.  The district court, utilizing the doctrine of contra proferentum, found coverage to exist.  This is a question of law subject to plenary review on appeal.  Taylor v. Continental Group, 933 F.2d 1227, 1232 (3d Cir. 1991).

The contra proferentum doctrine holds that ambiguities in an insurance policy are to be resolved in favor of the insured.  Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 (3d

---

[6].     In presenting their motions for summary judgment, the parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact.

Cir. 1993). We look to the number of reasonable interpretations a given contract, provision, or term may receive in determining ambiguity. Taylor, 933 F.2d at 1232. If we find but one reasonable interpretation, then a fortiori there can be no ambiguity. However, if the language is susceptible to more than one reasonable interpretation, then it will be found to be ambiguous. Stendardo v. Federal Nat'l Mortgage Ass'n, 991 F.2d 1089, 1094 (3d Cir. 1993).

> Here the district court held:
> In this case, we conclude that reasonable persons reading the plan descriptions for the basic life insurance and the supplemental life insurance could fairly come to either of the following conclusions: (1) that AD&D coverage is inherent in the phrase "life insurance" such that any supplemental life insurance purchased would automatically include AD&D coverage, or (2) that because AD&D is specifically referred to in the basic plan and not in the supplemental, it was simply not a part of the latter. While our determination that the language is ambiguous hinges on an objective reading of the challenged passage, we find support for this result in the confusion among the defendants in the days and weeks following Dr. Curcio's death.

Slip op. at 11-12. We disagree with the district court's analysis in two respects. First, our review of the policy does not reveal an ambiguity. Capital Health seems to have created the ambiguity. Second, the term "life insurance," when given its fundamental and universally accepted meaning, does not include AD&D coverage. Although our role here is to determine whether there are two possible meanings, were we given the task of

interpreting the term, we would hold that the certainty and predictability that a literal construction of the term "life insurance" would provide would better serve the purposes of ERISA.  Cf. Rolhman v. Hawkeye-Security Insurance Co., 502 N.W.2d 310 (Mich 1993)(giving a literal construction to the term "occupant" in interpreting the Michigan no-fault act).

The record reveals that the original policy applicable to Dr. Curcio clearly differentiated between life insurance and AD&D insurance.  In the table of contents under the heading of "COVERAGES," there were two entries.  Each was discussed separately, the policy set forth two different filing instructions for each respective claim, each had different termination periods, and the payment of benefits to beneficiaries was provided for separately.  Most importantly, life insurance benefits were to be paid upon proof of death; however, AD&D benefits were payable in the event of an accident resulting in an enumerated injury or death.  The two are mutually exclusive, that is, one could exist without the other.  Suggesting that life insurance would include AD&D coverage is inconsistent with their basic definitions.

When Capital Health asked that supplemental insurance be made available to all employees, the policy was amended accordingly.  First, an amendment which described the schedule for the supplemental coverage was added to the original policy, which discussed life insurance only.  Subsequently a new policy was issued.  This policy, similar to the original, had separate entries for life and AD&D coverage.  In setting forth the basic

coverage in the master schedule, the new policy mimicked the original.  It stated in pertinent part:

> BASIC INSURANCE (Non-Contributory)*
> Life, Accidental Death and Dismemberment Insurance
> Class          Life                    AD&D (Full Amount)

The very next page described the newly offered supplemental life coverage.  Unlike the previous page, it stated:

> SUPPLEMENTAL INSURANCE (Contributory)
> Life Insurance

The headings on these pages make clear that the supplemental insurance included only life coverage, not AD&D.  Similar to the original policy, the new policy also distinguished between life and AD&D coverage.  It contained two different entries in the table of contents, life and AD&D were discussed separately in the text, the policy set forth two different filing instructions for each respective claim, each had different termination periods, and the payment of benefits to beneficiaries was provided separately.  Additionally, the new policy clearly set forth a 90 day waiting period for basic life and AD&D coverage, but required 30 days for the supplemental life insurance.  The supplemental life coverage terminated at age 70, contrary to AD&D and basic life.

The foregoing policies and amendments were provided to Capital Health, but there is no evidence that Capital Health ever distributed them to its employees.  In fact, it appears that when John Hancock offered to Capital Health copies of the policies and

their amendments to give to the employees, Capital Health declined. Rather, Capital Health chose to make and distribute its own summaries. As we discuss infra, it was Capital Health's summary of the new policy that created the confusion.

Therefore, we conclude that John Hancock's insurance policies were not ambiguous. Further, the district court's suggested interpretation of the term life insurance is overly broad; life insurance does not inherently include AD&D insurance. The district court erred in the initial steps of its analysis. Thus, we will reverse the district court's order granting Mrs. Curcio's motion for summary judgment with respect to John Hancock and enter an order granting judgment in its favor.[7]

We turn now to the issues involving Capital Health.

IV.

ERISA provides:
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any

_____

[7]. Because we find that the insurance policy is not ambiguous, we need not address the parties' arguments regarding the district court's use of the contra proferentum doctrine. We note in passing that any question about the use of this doctrine in ERISA cases that was left open in Taylor v. Continental Group, 933 F.2d 1227 (3d Cir. 1991) was answered in our decision in Heasley v. Belden & Blake Corp., 2 F.3d 1249 (3d Cir. 1993).

discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).[8]

Capital Health argues that ERISA only permits suits to recover benefits against the plan as an entity and against the fiduciary of the plan, and because Capital Health is neither of these, it is not a proper party under ERISA. Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir. 1985) (citing §§ 1132(d), 1109(a) and 1105). The district court agreed with Capital Health that it is neither a "plan" nor a fiduciary. We believe it self evident that Capital Health is not a "plan;" however, we take issue with the failure to find fiduciary status.

We agree with the district court that the linchpin of fiduciary status under ERISA is discretion. Here the district court found that "John Hancock's refusal to follow Capital Health's directive indicates that the employer wielded no discretionary authority over the granting of benefits." Slip op. at 11. Thus it concluded that Capital Health could not be held liable for Curcio's benefits. It appears the district court relied on the second phrase of subsection (i) above, "authority

---

[8]. It is without doubt that the insurance policy at issue here is part of an employee benefit plan within the meaning of ERISA. 29 U.S.C. § 1002(1) and (3). In order to comply with ERISA requirements, 29 U.S.C. § 1022, Capital Health published to its employees a Statement of ERISA Rights and a list of General Provisions and Information. Further, John Hancock asserted in paragraph four of its motion to remove this case to federal court that the life insurance policy is an employee welfare plan subject to the provisions of ERISA.

or control respecting management or disposition of its assets,"
as the basis for its decision. 29 U.S.C. § 1002(21)(A)(i).
Unfortunately, the court failed to examine how the first phrase
of subsection (i), respecting the management of the plan, or
subsection (iii), the plan's administration, might affect Capital
Health's fiduciary status.[9] This is where we continue the
analysis.

Our task, simply stated, is to resolve whether Capital
Health maintained any authority or control over the management of
the plan's assets, management of the plan in general, or
maintained any responsibility over the administration of the
plan. If we find such to be the case, we have a fortiori found
Capital Health to be a fiduciary. We start from the standpoint
that we have previously held that ERISA broadly defines a
fiduciary. Smith v. Hartford Ins. Group, 6 F.3d 131, 141 n.13
(3d Cir 1993). See also H. Stennis Little, Jr. and Larry T.
Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30
Vand. L. Rev. 1, 4 (1977).

In Smith we found a hospital that gave assurances of
continued coverage after changing health plans to be a fiduciary
responsible for its employees' loss in benefits when the new plan
failed to cover a disabled employee. We noted that fiduciary
status under ERISA is broadly defined and held that the
circumstances of that case dictated our finding that the hospital

---

[9]. Subsection (ii) does not seem to apply nor does Mrs.
Curcio so argue.

was a fiduciary.  Smith, 6 F.3d at 141 n.3.  The particular circumstances of Smith are similar to our facts here.  After the hospital decided to replace its Blue Cross/Blue Shield policy with a self-funded insurance plan and because the employees had the option to convert to an individual Blue Cross/Blue Shield policy instead of enrolling in the new plan, the hospital's personnel director conducted seminars to help employees make their choices.  Id. at 135-36.  On the basis of these actions, we found the hospital to have fiduciary status.

Similarly, in Genter v ACME Scale & Supply Co., 776 F.2d 1180 (3d Cir. 1985), we held that ACME Scale & Supply met the ERISA definition of fiduciary as an employer-administrator of the plan at issue.  Id. at 1184.  We found that the employer exercised discretionary authority and control in managing the plan by notifying certain employees when they were eligible for an increase in life insurance coverage not explained in the terms of the plan.  Id. at 1184-85.  The employer's failure to notify all employees generally was deemed a breach of the fiduciary duty ERISA imposes.  Id. at 1185-86.  See also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133 (3d. Cir. 1993) (finding employer to have fiduciary status solely on the basis of its role as plan administrator under ERISA); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir. 1990) (holding that when employers serve as plan administrators, they assume the role of fiduciary under ERISA).[10]

_____

[10].    We have previously summarized the law in this area as follows:

ERISA makes clear that a fiduciary is one that maintains discretionary authority or discretionary responsibility in the administration of the plan.[11]  ERISA defines "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated."  §§ 1002(16)(A)(i) (other definitions are stated, but are not applicable here).  Capital Health, in its employee benefits booklet, labels itself as the plan administrator.[12]  It seems

(..continued)

> [W]here an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by ERISA attach.  Where, however, employers conduct businesses and make business decisions not regulated by ERISA, no fiduciary duties apply.  And, when employers wear "two hats" as employers and as administrators ". . . they assume fiduciary status `only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA."

Payonk v. HMW Industries, Inc., 883 F.2d 221, 225 (3d Cir. 1989) (citations omitted).

[11].      Section 1102(a)(1) states that "[e]very employee benefit plan . . . shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." Section 1102(a)(2) further states that "the term 'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary."  We have been unable to locate, nor do the parties point out, the "named fiduciary" of the Capital Health plan.

[12].      Capital Health calls to our attention a case from the Ninth Circuit that it claims supports its position that it is not a fiduciary.  Gelardi v. Pertec Computer Corp., 761 F.2d 1323 (9th Cir. 1985).  Gelardi is easily distinguishable for, unlike

obvious to us that a plan administrator has responsibility in the administration of the plan.  H. Stennis Little, Jr. and Larry T. Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand. L. Rev. 1, 6 (1977).

Here Capital Health announced the new plan to its employees through literature and meetings.  Indeed, at the plan's inception John Hancock offered to print booklet certificates for each and every employee, but Capital declined.  Capital Health chose to print and distribute its own booklet certificates describing the plan and each of the plan's amendments.  The general information section of the Choice Plus Booklet distributed by Capital Health stated that the plan would be administered through the Employee Relations Department of Capital Health Systems.  It further stated that Capital Health could modify or amend the plan at any time at its sole discretion, and that Capital Health could terminate the plan at any time.  Finally, the information provided that a covered person's benefits may not be assigned, except by the consent of Capital

(..continued)
our case, the employer relinquished its role as plan administrator by hiring an outside corporation to administer the plan; and as a result, the Ninth Circuit held that the employer was not "a fiduciary because it retained no discretionary control over the disposition of claims."  Id. at 1325.  Surprisingly, the court also held that the retained administrator was not a fiduciary because it did not "exercise fiduciary responsibilities in the consideration of claims.  [It] perform[ed] only administrative functions, processing claims within a framework of policies, rules, and procedures established by others."  Id. at 1325.  We emphasize that the Ninth Circuit, similar to the district court here, failed to analyze the definitional section of fiduciary pertaining to the plan's administration. § 1002(21)(A)(iii).

Health.  The Supreme Court has held that "one is a fiduciary to the extent he exercises any discretionary authority or control." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989).

We conclude that Capital Health maintained sufficient discretionary authority and responsibility in the administration of the plan so as to satisfy the statutory definition of a fiduciary, § 1002(21)(A)(iii), thus making it a proper party under ERISA.[13]  Therefore, we need not address Curcio's contention that ERISA permits suits against parties other than plans and fiduciaries.[14]nn  We caution in passing, as we have

---

[13].       Our holding is with respect to § 1002(21)(A)(iii) only. As stated above, the first phrase of subsection (i), authority or control respecting the management of the plan, may also lend support; however, it is unnecessary for our conclusion here, and we reserve for another day the task of defining its parameters.

[14].       ERISA affords the beneficiary of an employee benefit plan opportunity the ability to bring a civil suit to recover benefits due.  It provides in part:

(a) Persons empowered to bring a civil action
A civil action may be brought--

(1) by a participant or beneficiary . . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary  . . . (B) to obtain other appropriate equitable relief . . . (ii) to enforce any provisions of this subchapter or the terms of the plan.

before, that the district courts should not easily fashion additional ERISA claims and parties outside congressional intent under the guise of federal common law.  Plucinski v. I.A.M. Nat'l Pension Fund, 875 F.2d 1052, 1056 (3d Cir. 1989).

V.

We have held that an employer can be liable under ERISA in its fiduciary capacity for making affirmative misrepresentations on breach of fiduciary duty and equitable estoppel theories.  Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133-35 (3d Cir. 1993).  See also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, No. 93-1892, slip op.
(..continued)

*     *     *

(d) Status of employee benefit plan as entity

> (2)  Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

29 U.S.C. § 1132 (emphasis added).  Mrs. Curcio further contends that the "any other person" phrase of § 1132(d)(2) authorizes a suit against any person who undertake
ys a promissory obligation to provide benefits pursuant to the terms of an ERISA regulated plan.  Although she argues that such is plainly the rule in the Third Circuit, the cases she cites clearly do not support this theory.  Heasley v. Belden and Blake Corp., 2 F.3d 1249, 1258 n.10 (3d Cir. 1993); Ulmer v. Harsco Corp., 884 F.2d 98, 102 n.1 (3d Cir. 1989); Anthius v. Colt Industries Operating Corp., 789 F.2d 207, 212-13 (3d Cir. 1986).

at 23 (3d Cir. 1994); Smith v. Hartford Ins. Group, 6 F.3d 131, 141 n.13 (3d Cir. 1993). Here Mrs. Curcio primarily presents an equitable estoppel claim, which is authorized under ERISA pursuant to § 1132(a)(3)(B) set forth above. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1298 (3d Cir. 1993) (holding that § 1132(a)(3)(B) authorizes the award of appropriate equitable relief to a beneficiary for violations of ERISA).[15] She alternatively argues that Capital Health is subject to liability for breach of its fiduciary duty pursuant to § 1109.[16]

---

[15]. Notably, we have recently held that damages are not recoverable under § 1132(a)(1)(B). Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, No. 93-1892, slip op. at 24. Here, Mrs. Curcio relies on § 1132(a)(3)(B).

[16]. (A) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109.

Mrs. Curcio argues that Capital Health need not be a fiduciary to be found liable under an equitable estoppel theory under ERISA. Because we find Capital Health to be a fiduciary, we need not reach this issue. Cf. Smith v. Hartford Ins. Group 6 F.3d 131, 141 n.13 (3d Cir. 1993) (intimating that fiduciary status is required to be liable on an equitable estoppel claim under ERISA).

We turn first to Mrs. Curcio's primary argument that Capital Health's representations made in describing its new plan to its employees give rise to an equitable estoppel claim under ERISA. To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir. 1993) (citing Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir. 1991)). The district court did not address Mrs. Curcio's estoppel claim, presumably because it found Capital Health to be an improper party under ERISA. The determination of an equitable estoppel claim is a mixed question of law and fact. Fischer, 994 F.2d at 135. Here the parties do not dispute the facts -- the written record contains all the evidence. Indeed, in presenting their motions for summary judgment, the parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact. Having found Capital Health to be a proper party, we now turn to her equitable theory.[17]

_____

[17]. The equitable theory of relief under ERISA is not to be construed as conflicting with our precedent precluding oral or informal amendments to ERISA benefit plans. Confer v. Custom Engineering Co., 952 F.2d 41, 43 (3d Cir. 1991); Frank v. Colt Industries, Inc., 910 F.2d 90, 98 (3d Cir. 1990)' Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163-64 (3d Cir. 1990). Cf. Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, No. 93-1892 n.6 (3d Cir. 1994). Here, Capital Health not only made oral representations, but also distributed written material describing the coverage.

A.

First, Mrs. Curcio must show that Capital Health made material representations. Capital Health's representations regarding supplemental life and supplemental AD&D insurance began with an audio-visual presentation that Capital Health made in an effort to solicit its employees to enroll in its new insurance program entitled "New Choice Plus Flexible Benefits Plan." The audiotape, which was accompanied by slides, stated in pertinent part:

> In short, this is a one time offer. You can either take advantage of the current enrollment period **to increase your life and AD&D insurances significantly** or wait until future years to increase coverages on a slower year to year basis. (Emphasis added.)

This was not the only time Capital Health discussed life and AD&D insurance together. In the summary plan description that Capital Health furnished to its employees for the original coverage, the section describing the amounts of insurance coverage discussed life and AD&D as separate coverages. Nonetheless, in stating the amount of coverage, the summary plan document stated that the AD&D coverage would be "[a]n amount equal to your Term Life Insurance." When Capital Health made Choice Plus available, the plan that provided supplemental life and AD&D coverages, rather than provide a formal amendment to the summary plan description, it furnished a pamphlet with a section entitled "Group Life & AD&D Insurance Coverages." Cf. Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310 (3d Cir. 1991) (overview

brochure did not meet ERISA requirements for supplemental summary

plan description).  This section begins:

> The Capital Health System provides all
> employees scheduled to work at least 16 hours
> a week with Basic Group Life Insurance and
> Accidental Death and Dismemberment (AD&D)
> Insurance at **no cost**.
>
> With **Choice Plus** you also have the
> opportunity to purchase additional amounts,
> up to three times your Base Annual Earnings,
> at low group rates.

Finally, this section of the pamphlet concludes:

> This pamphlet highlights the Group Life
> Insurance and Accidental Death and
> Dismemberment Insurance coverages available
> to you.  For more detailed information on
> your plans, you should refer to your Summary
> Plan Descriptions covering them.  If
> questions arise, the Legal Plan Documents
> will govern in all cases.

Although the foregoing is a general summary of the

coverages discussed in this section of the pamphlet, coupling

this information, which describes the coverages as separate but

related, with the other information furnished to the employees,

it was reasonable for Dr. Curcio to conclude that both life and

AD&D insurance would continue to be made available in equal

amounts, that is, in supplemental form.  Cf. 29 U.S.C. §

1024(b)(1)(A) (requires that material modifications be written in

a manner calculated to be understood by the average plan

participant).  Genter v. Acme Scale & Supply Co., 776 F.2d 1180,

1185 (3d Cir. 1985) (holding that a "summary plan description

must not mislead, misinform, or fail to inform participants and

beneficiaries of the Plan").  See also Bower v. Bunker Hill Co., 725 F.2d 1221, 1224-25 (9th Cir. 1984)(misleading summary plan description coupled with management misrepresentations precluded summary judgment for employer).

Nevertheless, the question is whether these representations are material.  We have held that any provision of a plan subject to ERISA that establishes a benefit is a material term of the plan.  Baker v. Lukens Steel Co., 793 F.2d 509, 512 (3d Cir. 1986).  Here Capital Health was actually representing that the plan was offering a new benefit; thus, we find that the representations Capital Health made were "material representations."  See also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d. Cir. 1993) ("[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision . . . .").

B.

Second Mrs. Curcio must demonstrate reasonable and detrimental reliance upon the representations Capital Health made.  This factor, which is generally referred to as reliance, has within it two subfactors: reasonableness and injury.  Smith, 6 F.3d at 137.[18]  Mrs. Curcio testified in a sworn statement that

---

[18].  But see Edwards v. State Farm Mut. Auto. Ins. Co., 851 F.2d 134, 137 (6th Cir. 1988)(employee benefit plan claimant who had been misled by summary plan description and reassuring letter from management, need not show detrimental reliance). Because it is inconsistent with our precedents, we have previously declined to follow Edwards.  Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 n.8 (3d Cir. 1991).

she and her husband discussed the options available under the Choice Plus program, "including increasing the death and dismemberment coverage."  She testified that they had recently bought a home and because the coverage was so reasonably priced, they joked about his dying in an accident, her receiving double benefits, and paying off the mortgage.  Subsequent to this discussion, Dr. Curcio filled out an enrollment form electing the maximum amount of coverage.  This form referred only to "Group Life Insurance Options."  One month later, Dr. Curcio signed another form confirming his elections and the appropriate payroll deductions.  This second form did not distinguish between life and AD&D coverage for either basic or supplemental benefits.

In Smith we held that the plaintiff's conclusory allegations that the Smiths could have obtained alternative coverage, without more, were insufficient to withstand summary judgment.  Smith, 6 F.3d at 137.  Here we find the meeting between Dr. and Mrs. Curcio significant.  There is more than conclusory statements; the Curcios had an actual discussion about the protection being afforded through the purchase of additional AD&D insurance.  For these reasons we conclude that the Curcios have suffered an injury in giving up an opportunity to accommodate their insurance needs through an independent insurance carrier because of their reasonable reliance on Capital Health's representations.  Cf. McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985) ("It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex

document, and then proclaim that any inconsistencies will be governed by the plan.  Unfairness will flow to the employee for reasonably relying on the summary booklet.")

C.

Finally, Mrs. Curcio must demonstrate the existence of extraordinary circumstances.  We have not specifically defined this term, rather we rely on caselaw to establish its parameters.  In Rosen v. Hotel and Restaurant Employees and Bartender's Union, 637 F.2d 592 (3d Cir. 1981), we found that extraordinary circumstances existed when the trustee of a pension fund advised Rosen that his pension was in jeopardy due to his employer's failure to make payments to the fund, allowed Rosen to write out a check for the remainder of the employer's debt, and deposited the check.  Id. at 598.  We held that the trustee was then estopped from asserting that Rosen's payment did not entitle him to his pension.  Id.  By contrast, in Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310 (3d Cir. 1991), Gridley, while continually and totally disabled in the hospital, increased his life insurance coverage under a plan that specifically required active, full-time status for such an increase.  Although the employer deducted additional amounts from his salary to cover the increase, we found that extraordinary circumstances did not exist when the insurance carrier refused the additional amount.  Id. at 1319 (citing Hozier v. Midwest Fasteners Inc., 908 F.2d 1155, 1165 n. 10 (3d. Cir. 1990).

Under the facts of Smith, which are similar to our case here, we held that the fact finder could determine that extraordinary circumstances were established. Smith, 6 F.3d at 142. In Smith the hospital repeatedly made written and oral assurances that Mrs. Smith had a specific type of coverage. Id. Ironically, here we have another hospital misrepresenting the type of coverage for which recipients could enroll. Capital Health compounded its error by reassuring Mrs. Curcio that she was covered in the amount of $400,000 after the accidental death of her husband. In the face of such a tragic loss there is a certain degree of solace in knowing that financial woes are not on the horizon. Although it was not in Capital Health's control, John Hancock contributed to the anguish by first confirming the coverage Mrs. Curcio expected and then disclaiming that such protection would be forthcoming.

The roller coaster did not stop there. Capital Health supported Mrs. Curcio's claim to the point of encouraging her to file suit, even offering to pay her legal fees. It retained outside counsel to review the matter and offered his services to her without charge. It continually urged John Hancock to honor the supplemental AD&D, despite John Hancock's refusal. Somewhere along the way Capital Health had a change of heart, for they now argue that supplemental AD&D was never offered in the first place.

These events in our view are demonstrative of extraordinary circumstances. Thus, having satisfied the elements of her equitable estoppel claim and there being no reason to

remand for further factual development, we conclude that Mrs. Curcio has established Capital Health's liability to her in the amount of $150,000.[19]  Alternatively, we now briefly address Mrs. Curcio's argument regarding breach of fiduciary duty.

VI.

In Fischer we held that a plan administrator may not materially misrepresent, either negligently or intentionally, modifications to an employee pension benefits plan.  "Put simply, when a plan administrator speaks, it must speak truthfully." Fischer, 994 F.2d at 135.  See also Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (discussing fiduciary's duty not to misinform); Kurz v. Philadelphia Elec. Co., 994 F.2d 136, 139 (3d Cir. 1993) (discussing the holding in Fischer).  We further held in Fischer that material misrepresentations would subject a plan administrator to liability for breach of its fiduciary duty. Fischer, 994 F.2d at 133-34 (citing Payonk v. HMW Indus., Inc., 883 F.2d 221 (3d Cir. 1989)).  We have just found Capital Health responsible for making material misrepresentations for purposes

---

[19].      The dissent suggests, inter alia, that we should remand to the district court for factfinding on the elements of equitable estoppel.  We note, however, that the parties do not dispute the facts.  The parties stipulated that the district court adjudicate all claims without trial solely on the basis of the written record, including the resolution of any material issues of fact.  We are of the view that reasonable minds could not differ on the establishment of the elements of equitable estoppel in this case.  Accordingly, it is appropriate for us to require the district court to enter judgment.

of an equitable theory of relief. It is thus a short step to conclude that Capital Health breached its fiduciary duty.

Our analysis rests on the notion that a fiduciary is required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). See Fischer, 994 F.2d at 133. Clearly Capital Health did not do so. Therefore, we hold that Mrs. Curcio's alternate argument provides additional support for our conclusion that Capital Health is liable to Mrs. Curcio for the $150,000 in supplemental AD&D.

## VII.

On the basis of the foregoing, we will reverse in part and affirm in part the district court's order. We will reverse that part of the order which denied John Hancock's motion for summary judgment and granted it in favor of Capital Health. We will affirm that part of the court's order which granted Mrs. Curcio's motion for summary judgment and entered judgment in her favor, but we will reverse the judgment entered against John Hancock and enter it against Capital Health in the amount of $150,000.

McKELVIE, District Judge, dissenting.

I agree that the district court should grant summary judgment in favor of John Hancock. However, I believe that this court should remand the claims against Capital Health for further proceedings.

One could summarize the facts in this case as follows. Capital promised its employees, including Dr. Curcio, a package of benefits. Capital promised to set up a plan, to provide free life and AD&D insurance through the plan, and to make available the opportunity to purchase supplemental insurance. Capital named itself the "Plan Administrator," and took on the responsibility of describing the terms of the plan to the beneficiaries. Capital negotiated an insurance contract with John Hancock. Hancock had no direct contact with the beneficiaries. Capital collected payments from the employees, added its own contribution, and sent Hancock a lump sum payment every month. The plan owns no relevant assets other than its contract with Hancock. Dr. Curcio purchased as much life and AD&D insurance as was available, and named his wife as beneficiary. Mrs. Curcio alleges, and Capital denies, that the supplemental insurance Capital promised to make available includes an additional $150,000 of AD&D coverage. Regardless of what Capital may have promised its employees, Hancock's contract with Capital does not obligate Hancock to pay supplemental AD&D benefits.

Procedural Posture and Standard of Review

In the district court, the parties filed motions for summary judgment. The parties also stipulated that the district court could adjudicate all claims based solely on the written record without a trial, including the resolution of any material issues of fact. The district court found as a matter of law that Capital is not liable and Hancock is liable. The district court then entered summary judgment in favor of Mrs. Curcio and against Hancock, and in favor of Capital. The district court did so without resolving the remaining issues of fact.

Entry of summary judgment is only appropriate if when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact such that a reasonable factfinder could return a verdict for that party. Slip op. at 7-8. This court's review of an order granting summary judgment is plenary. Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 132 (3d Cir. 1993), cert. denied, 114 S.Ct. 622 (1993). If genuine issues of material fact remain unresolved, they should be resolved by the trier of fact. The district court is the trier of fact in this case. An appellate court should not act as the factfinder, even where all evidence comes from documents. See Fed. R. Civ. P. 52(a) ("Findings of fact [by a trial judge], whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . .").

## Enforcement of Plan Benefits

Mrs. Curcio argues that Capital promised to make available $150,000 in supplemental AD&D coverage, and that this

promise is enforceable under the benefits enforcement section of ERISA.  See 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .").  Capital argues that it did not make such a promise, and that in any event its promises are unenforceable because Capital is neither a plan nor a fiduciary.  The district court, relying on Gelardi, agreed with Capital that ERISA permits liability only against plans and fiduciaries.  See Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324-5 (9th Cir. 1985).

I believe that ERISA does permit a person to sue an employer to enforce contractual promises made by the employer, regardless of whether or not the employer is a plan or a fiduciary.  See Murphy v. Heppenstall Co., 635 F.2d 233 (3d Cir. 1980) (enforcing contractual rights against an employer where the plan is not a party), cert. denied, 454 U.S. 1142 (1982).  None of the sections of ERISA cited by the Gelardi court give any limitation on who may be sued.  See Lee v. Prudential Ins. Co. of America, 673 F. Supp. 998, 1003 (N.D.Cal. 1987).  Indeed, 29 U.S.C. § 1132(d) expressly contemplates that a person other than a plan may be held liable.  One of Congress' primary purposes for enacting ERISA is "to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 US 101, 113 (1989).  I believe that permitting employees to sue their employers for allegedly breaking promises relating to a benefits plan is

neither novel nor contrary to Congress' intent.  See Sprague v. General Motors Corporation, 768 F. Supp. 605, 612 (E.D.Mich. 1991).

There is a genuine issue of fact regarding whether Capital promised to supply the Curcios with $150,000 of AD&D coverage.  The task of determining the terms of a plan, and interpreting those terms, should be left in the first instance to the trial court.  See Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 96 (3d Cir. 1992).  I would therefore remand the case to the district court for further findings of fact.

### Equitable Estoppel

I disagree with the majority's decision to grant summary judgment against Capital on the equitable estoppel cause of action.  Mrs. Curcio has not established that there is no genuine issue of material fact as to all elements of this claim.

An ERISA beneficiary may recover benefits under an equitable estoppel theory "upon establishing a material representation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances."  Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir. 1993); cf. Restatement, Second, Contracts § 90 (common law doctrine of promissory estoppel).  Mrs. Curcio testified by affidavit that in the fall of 1990 her husband told her that he had seen a video tape at work, the video tape described his insurance benefits, and it was his understanding that these benefits included extra AD&D insurance.  The majority finds that the representations made on this tape were material, that the Curcios reasonably relied on

these representations to their detriment, and that extraordinary circumstances exist in this case. The district court did not make findings on these questions.

A trier of fact could find that it would not be reasonable for the Curcios to rely on the representations in the video presentation. The majority quotes from a pamphlet which Capital distributed to its employees. Slip op. at 22-23. A section of this pamphlet, titled "GROUP LIFE & AD&D Insurance Coverages," contains a subsection titled "An Opportunity to Purchase Supplemental Amounts of Insurance Coverages." The first sentence of this subsection states, "Through Choice Plus, you can purchase additional amounts of Group Life insurance at low group rates." There is no mention of any opportunity to purchase additional amounts of AD&D. Louise Reich, an employee of Capital, testified by affidavit that Dr. Curcio would have received a copy of a "Physician Fringe Benefit Summary." The Summary states that a physician may purchase "additional supplemental life," but does not mention any opportunity to purchase additional AD&D. A trier of fact may, or may not, find it reasonable to rely on one's memory of a taped presentation which may be in conflict with written materials.

To establish the elements of detrimental reliance, a plaintiff must show that the defendant's representations induced action or forbearance, and that the plaintiff was harmed by this action or forbearance. Restatement, Second, Contracts § 90; see also Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir. 1991), cert. denied, 111 S.Ct. 2856 (1991). Mrs. Curcio has

failed to present any evidence of detrimental reliance. The majority, finding that the Curcios did detrimentally rely on Capital's representations, seems to employ the following reasoning: Mrs. Curcio testified that she and her husband believed they had the opportunity to purchase supplemental AD&D insurance through Capital's benefits program. Therefore, they had the opportunity to purchase additional insurance through an independent insurance carrier. Therefore, they would have purchased additional AD&D coverage if only they had known that the death benefits provided by Hancock totalled $250,000, and not $400,000. See slip op. at 24-26.

As in Smith, there is no evidence that the Curcios could have obtained AD&D coverage from an independent insurance carrier. Cf. Smith, 6 F.3d at 137 ("the Smiths' conclusory allegations that they could have obtained alternative coverage, without more, were insufficient to withstand summary judgment"). Furthermore, there is no evidence that the Curcios had any intention of seeking insurance from an independent carrier. Mrs. Curcio has not proven that representations in the video tape caused detrimental reliance; there is no evidence that the representations induced any act or forbearance.

The majority concludes that extraordinary circumstances exist in this case, in part because it finds that the inconsistent positions taken by the defendants after Dr. Curcio's death forced Mrs. Curcio to embark on a roller coaster ride of anguish. Slip op. at 26-27. Several aspects of this portion of the majority's opinion are troubling. First, there seems to be

no standard for determining what makes an event "extraordinary," nor does the majority attempt to define a standard. It appears that when courts first recognized equitable estoppel as a cause of action in ERISA cases, the element of "extraordinary circumstances" was added in order to protect the actuarial soundness of pension funds. See Rosen v. Hotel and Restaurant Emp., Etc., 637 F.2d 592, 598 (3d Cir. 1981), cert. denied, 454 U.S. 898 (1981); Phillips v. Kennedy, 542 F.2d 52, 55 n. 8 (8th Cir. 1976). In a case where a fund is a defendant, a court could at least balance the desire to make the plaintiff whole against the need to ensure that the fund had sufficient assets to satisfy its obligation to future claimants. Here, where no fund is involved, the nebulous term "extraordinary" loses what definition it had, as there is no longer any stated purpose for the existence of the element.

Second, the case for finding extraordinary circumstances seems rather weak. In support of its conclusion that extraordinary circumstances exist, the majority makes the following arguments: (1) Capital misrepresented the Curcio's insurance coverage; (2) Capital repeated that mistake after Dr. Curcio died; (3) Hancock made the same mistake after Dr. Curcio died; (4) these mistakes caused Mrs. Curcio to experience anguish; and (5) for a while, Capital attempted to help Mrs. Curcio recover the disputed $150,000 from Hancock. See slip op. at 26-27. As every plaintiff in an estoppel case must prove detrimental reliance on a material representation, the fact that Capital made a misrepresentation could not possibly be an

extraordinary event. The fact that Capital repeated its mistake after Dr. Curcio died may be unfortunate, but it is beyond dispute that at that point it was too late to make other insurance arrangements. There is no evidence in the record that Mrs. Curcio suffered anguish, or any other harm, from the mistakes made after Dr. Curcio's death. It seems strange to penalize Capital for mistakes made by Hancock, and even stranger to penalize Capital for attempting to help Mrs. Curcio recover the benefits she claimed.

Third, the existence of extraordinary circumstances should be determined by the trier of fact. See Smith, 6 F.3d at 142. I do not think that the circumstances identified by the majority are so extreme in this case as to warrant this court finding that extraordinary circumstances exist.

Finally, even if Mrs. Curcio could prove all elements of her estoppel claim, the recovery may be less than $150,000. Full enforcement of a promise is often appropriate in an estoppel case. However, depending on the facts of the case, it may be appropriate to limit the recovery. See Restatement, Second, Contracts § 90 Comment d. Equitable estoppel is an equitable doctrine, and is subject to the discretion of the trial court. See Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989) ("when a trial court makes an equitable assessment after the operative facts are established, we review that assessment for abuse of discretion."); Plucinski v. I.A.M. Nat. Pension Fund, 875 F.2d 1052, 1053 (3d Cir. 1989) ("because the district court did not address the equities . . . we remand for a development of the

record, and for the district court to exercise its equitable discretion").

Misrepresentation

The majority states, correctly, that "a plan administrator may not materially misrepresent, either negligently or intentionally, modifications to an employee pension benefits plan." Slip op. at 28. The majority then finds that Mrs. Curcio established her claim for negligent misrepresentation. The majority makes no attempt to show why summary judgment is appropriate on the issue of whether or not Capital made its representations negligently or intentionally. The trier of fact should determine these questions in the first instance.

Furthermore, even if Mrs. Curcio does establish all elements of this cause of action, it is far from clear that she should receive an award of $150,000. The amount of damages for negligent misrepresentation by a fiduciary is not necessarily measured by the content of the misrepresentation, but by the damage caused to the beneficiary or by the profit received by the fiduciary as a result of the misrepresentation. Restatement, Second, Trusts § 205 Comment a. There is no evidence that Capital gained by its representations. As discussed above, there is also no evidence that Mrs. Curcio would have received greater death benefits but for Capital's misrepresentations. Therefore, it is inappropriate to direct the district court to award $150,000 on this claim on a motion for summary judgment.

## Conclusion

The trial court granted Mrs. Curcio's motion for summary judgment against Hancock, and granted Capital's motion for summary judgment against Mrs. Curcio. The majority disagrees with both decisions, yet instead of reversing both decisions it purports to affirm the judgment in favor of Mrs. Curcio and reverse on the question of which defendant loses. I would reverse both grants of summary judgment, direct that summary judgment be entered in favor of Hancock and against Mrs. Curcio, and remand for further proceedings on Mrs. Curcio's claims against Capital.

I respectfully dissent.